## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

CHRISTOPHER GREGG,
DIANE GREGG, and TRAVELPATH CANADA
LIMITED, a Canadian Corporation,

       Plaintiffs,

v.                                    Case No.:

IRA A. SOLOMON, HELENE SOLOMON,
CAROL DUDLEY, JIL SHAPIRO, EMM ENTERPRISES,
INC., a Florida Corporation,
d/b/a REALTY WORLD SOUTH FLORIDA,
and BALISTRERI REALTY, INC.,
a Florida Corporation,

       Defendants.

_____/

## COMPLAINT FOR DAMAGES

Plaintiffs, CHRISTOPHER GREGG, DIANE GREGG, and TRAVELPATH CANADA LIMITED, by and through their undersigned counsel, hereby file this Complaint for Damages against Defendants, IRA A. SOLOMON, HELENE SOLOMON, CAROL DUDLEY, JIL SHAPIRO, BALISTRERI REALTY, INC., and EMM ENTERPRISES, INC., d/b/a REALTY WORLD SOUTH FLORIDA.

## GENERAL ALLEGATIONS

### Nature of Action

1.     This is an action for damages in excess of the jurisdictional minimum of this Court, exclusive of costs and attorney's fees, which arises out of wrongful acts or omissions committed by Defendants and/or their agents or employees in Broward County, Florida. The

1

claims asserted herein are (a) one count for Breach of Written Contract against Defendants IRA A. SOLOMON and HELENE SOLOMON; (b) two counts for Negligence/Breach of Statutory Duty, and one count for Negligent Misrepresentation against Defendant CAROL DUDLEY; (c) one Count for Negligence and one count for Negligent Misrepresentation against Defendant JIL SHAPIRO; (d) three counts for Vicarious Liability against Defendant BALISTRERI REALTY, INC; and (e) two counts for Vicarious Liability against Defendant EMM ENTERPRISES, INC., d/b/a REALTY WORLD SOUTH FLORIDA.

### Conditions Precedent

2.     All conditions precedent to the maintenance of this action have been satisfied, or have been waived or excused.

### The Parties

3.     Plaintiffs CHRISTOPHER GREGG and DIANE GREGG (the "Greggs"), are a married couple, and are citizens of Canada.

4.     Plaintiff TRAVELPATH CANADA LIMITED ("Travelpath Canada"), is a Canadian Corporation, which is domiciled and maintains its principal place of business in Ontario, Canada.  The Greggs are the principals of, and owners of all beneficial interest in, Travelpath Canada.  Plaintiff Christopher Gregg is the President of the Company.

5.     Defendants IRA A. SOLOMON and HELENE SOLOMON (the "Solomons" or "sellers") are, and at all times material were, citizens of the State of Florida, and residents of Broward County, Florida.

6.     Defendant CAROL DUDLEY ("Dudley"), was, at all times material, the licensed real estate broker and/or agent representing Plaintiffs in connection with the purchase of the real property and house situated thereon, located at 2 Compass Isle, Fort

Lauderdale, Florida, 33308. (the "Compass Isle Property" or the "subject property").

7.     Defendant BALISTRERI REALTY, INC. ("Balistreri Realty") is a Florida corporation, with its principal place of business located in Pompano Beach, Florida.  At all times material, Defendant Balistreri Realty was the principal and/or employer of Defendant Dudley.

8.     Defendant JIL SHAPIRO ("Shapiro") was, at all times material, the licensed real estate broker and/or agent representing the Solomons in connection with the sale of the Compass Isle Property.

9.     Defendant EMM ENTERPRISES, INC., d/b/a REALTY WORLD SOUTH FLORIDA ("Realty World South Florida") is a Florida corporation, with its principal place of business located in Fort Lauderdale, Florida.  At all times material, Defendant Realty World South Florida was the principal and/or employer of Defendant Shapiro.

**Jurisdiction and Venue**

**A.     Personal Jurisdiction**

10.     The Court has personal jurisdiction over all the Defendants, in that at the time of the acts and omissions giving rise to this action and/or at the present time, Defendants were/are residents and domiciliaries of the State of Florida, and/or Defendants were/are doing business in the State of Florida, and/or the wrongful acts and omissions giving rise to this action were committed by Defendants within the State of Florida.

**B.     Subject Matter Jurisdiction**

11.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S. C. § 1332(a)(2), as the amount in controversy exceeds $75,000, exclusive of interest and costs,

and the action is between citizens of the State of Florida and citizens of Canada.

### C.     Venue

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, in that the Defendants reside and/or are domiciled in the Southern District of Florida, specifically Broward County, Florida.  Furthermore, Broward County, Florida is where a substantial part of the events or omissions giving rise to the claims alleged herein occurred and where the property that is the subject of the action is situated.

### The Contract

13.     In March 2015, pursuant to a Residential Contract For Sale And Purchase (the "Contract"), the Greggs contracted with the Solomons to purchase the Compass Isle Property.  The Contract was executed by the Greggs on March 19, 2015, and by the Solomons on March 20, 2015.  Among other provisions, there was a handwritten provision inserted under paragraph number 20 of the Contract, which was hand-initialed by the Solomons.  The provision states: **"Seller will deliver a copy of the HOA documents to the buyer via its broker within 5 days of Effective Date."** (Copy of the Contract attached hereto as Exhibit A).

### Relevant Pre-Closing E-Mail Communications Among the Parties

14.     In March, 2015, after the Contract was executed, various e-mail communications transpired among the various parties.  The content of these e-mails, or relevant portions thereof, are set forth below:

**March 21, 2015 at 14:31:15** – email from Jil Shapiro to Carol Dudley [Ms. Shapiro wrote: "Please find attached the Bay Colony Bylaws per contract request.  I will be sending them in 2 emails as they are large."]

**March 21, 2015 at 12:02 PM** – email from Carol Dudley to Diane Gregg forwarding the preceding (14:31:15) email and attachment from Jil Shapiro to Carol Dudley [Ms. Dudley did not write any message to Ms. Gregg, but just forwarded Ms. Shapiro's above-mentioned March 21, 2015 email]

**March 21, 2015 at 14:34:33** – email from Jil Shapiro to Carol Dudley [Ms. Shapiro wrote: "Attached HOA Docs."]

**March 21, 2015 at 12:04 PM** - email from Carol Dudley to Diane Gregg, forwarding the preceding (14:34:33) email and attachment from Jil Shapiro to Carol Dudley [Ms. Dudley wrote: "Please find more documents."]

**March 21, 2015 at 14:39:04** – email from Jil Shapiro to Carol Dudley [Ms. Shapiro wrote: "Please find attached Bay Colony Bylaws as per contract request.  I will be sending them in 3 emails as the files are too big…"]

**March 21, 2015 at 12:09 PM** – email from Carol Dudley to Diane Gregg, forwarding the preceding (14:39:04) email and attachment from Ms. Shapiro to Ms. Dudley [Ms. Dudley wrote to Ms. Gregg: "Forwarding more documents for you.  I think there is one more to come."]

**March 24, 2015 at 8:37 AM** – email from Christopher Gregg to Carol Dudley and Rick Balistreri (of Defendant Balistreri Realty), and Diane Gregg [Mr. Gregg wrote: "After a review of the HOA documents provided by Carol [Dudley] on Mar. 21 we have been advised there is no clause prohibiting paying and non-paying guests from occupying the premises at 2 Compass Isle under the ownership of the Greggs or an assigned company.  Diane [Gregg] has requested confirmation that **all** of the HOA documents have been sent to us.  As of now we have not been provided the confirmation from either the vendor's realtor or Carol…The

5

Greggs are acting in good faith that we are in possession of all HOA documents, which having been reviewed show no impact on paying and non-paying guests from accessing and occupying the premises at 2 Compass Isle. The above does not negate our ongoing request for confirmation that we are in receipt of all HOA documents..." (emphasis in original)].

**March 24, 2015 at 9:00 AM (or shortly before)** – email from Carol Dudley to Christopher and Diane Gregg [Ms. Dudley wrote: "I have been working for you this morning and had a long chat with the seller's realtor [Jil Shapiro]. Everything Jil sent me and I forwarded to you were the **FULL HOA** docs. I have asked the seller's realtor to double check and to send everything again so we do not miss anything at all..." (emphasis in original)].

(Copies of the foregoing e-mails are attached hereto as Composite Exhibit B).

15.    In light of the above email communications, and in particular, the email written by Plaintiff Christopher Gregg on March 24, 2015 at 8:37 AM, and the email written by Defendant Dudley that same day at approximately 9:00 AM, all Defendants herein knew or should have known that it was vital for the Greggs to determine whether there were any HOA rules, requirements and/or restrictions that would have an impact upon rentals of the subject property. Furthermore, the Greggs made it known to the Defendants, on multiple occasions, that but for being able to rent out the subject property for short term and vacation rentals, uninhibited by any requirements or restrictions contained in HOA documents, or otherwise, they or their assignee would not go forward with the closing and purchase of the property.

### The Failure of Defendants to Provide the Full HOA Documents to Plaintiffs

16.    Notwithstanding (a) Plaintiff Christopher Gregg's e-mail to Defendant Dudley

and Rick Balistreri of March 24, 2015 at 8:37 AM, emphasizing the importance and necessity of receiving "**all** of the HOA documents," particularly those impacting or bearing upon the ability of paying and non-paying guests from accessing and occupying the Compass Isle Property, and requesting confirmation that all HOA documents had been received; (b) Defendant Dudley's e-mail to the Greggs of March 24, 2015 at 9:00 AM, representing that the Greggs had been provided with the "**FULL HOA** docs"; (c) Defendant Shapiro's assurances to Defendant Dudley (and, by proxy, to the Greggs) that the **FULL HOA** documents had been provided; and (d) the provision in the Contract stating that, "**Seller will deliver a copy of the HOA documents to the buyer via its broker within 5 days of Effective Date**," neither the Solomons, nor their broker, Defendant Shapiro, nor Defendant Realty World South Florida, or anyone acting on said Defendants' behalf, provided the Greggs with the full HOA documents within 5 days of the effective date of the Contract, or at any time thereafter.   Nor did Defendant Dudley, Defendant Balistreri Realty, or anyone acting on their behalf, provide the full HOA documents to Plaintiffs at any time whatsoever.

17.   As it turned out, the HOA documents provided to Plaintiffs were incomplete, as they did not include the Rules of the Bay Colony Protective Association, Inc. ("Bay Colony Rules"), which govern properties in the Bay Colony development, including the Compass Isle Property.  Rule Number 11 of the Bay Colony Rules provides as follows:

"**Rentals** - All renters must appear before the Board of Directors for Board approval. Three references must be presented to the Board at least two weeks before said meeting. A minimum of three board members must be present at this meeting. To set up a time to meet with the Board, the prospective renter or the person who is renting the property shall contact the management company for a specific meeting time."

(Copy of Bay Colony Rules attached hereto as Exhibit C).

18.     Unbeknownst to the Greggs (or their subsequent assignee, Plaintiff Travelpath Canada), Rule 11 of the Bay Colony Rules has the practical effect of precluding (and continuing to preclude) Plaintiffs from procuring any short-term and/or vacation renters of the Compass Isle Property, including, but not limited to, Plaintiffs' clients, business associates and/or friends from Canada, where Plaintiffs reside.   Such individuals are obviously not going to travel down to Florida from Canada, at substantial expense and inconvenience in order to go through the above-mentioned onerous pre-screening process, in the hopes that they will be approved by the Bay Colony Board of Directors at some undetermined point in time, if at all, then travel back to Canada to await the Board's (positive or negative) decision, which even if positive, would be exceedingly unlikely to coincide with the desired date(s) of the rental, either from the point of view of Plaintiffs, or the prospective renter(s).

19.     In light of Bay Colony Rule 11, there would be (and currently remains) no viable or practicable way for Plaintiffs to schedule which prospective renters would be able to occupy the property when, and/or whether such occupancy would overlap with a time(s) that other prospective renters might be desirous of renting the property, or with a time that the Greggs, themselves, might choose to occupy the home.  Simply put, the Rule makes it impossible or impracticable to ever use the property for short-term or vacation rental purposes, thus frustrating one of the primary purposes for which the property was purchased, and significantly diminishing the utilization, usefulness and value of the property.

20.     Ironically, Plaintiffs were provided with all the HOA documents except for the one indispensable document that truly mattered (the Bay Colony Rules) in connection with their plans for the subject property, a document that contained the very restrictions on

8

rentals that they were led to believe, in good faith, did not exist.

21. It was not until August of 2015, some two months after the closing on the subject property, that Plaintiffs received a copy of the Bay Colony Rules from the HOA's management company, and thus learned of the Rule that would effectively preclude them from using the property for short-term and/or vacation rentals.

## The Greggs' Assignment of Their Rights Under the Contract to Travelpath Canada

22. On or about June 15, 2015, the Greggs assigned their rights under the Contract with the Solomons to Travelpath Canada, pursuant to a written Assignment of Contract for Purchase of Real Estate (the "Assignment"), and Travelpath Canada expressly accepted such rights as assignee, by and through its President, Plaintiff Christopher Gregg. (Copy of the Assignment attached hereto as Exhibit D).

23. The purchase of the Compass Isle Property would not have been consummated but for Plaintiffs' belief that they had been provided with the full HOA documents and that there were no rules or restrictions that would effectively preclude or make impracticable the use of the property for short term or vacation rentals. Nor would Plaintiffs have expended significant sums for, *inter alia*, renovations, repairs, improvements, maintenance, financing, and furnishings, had they known of the onerous requirements and restrictions pertaining to rentals, which make use of the property for short term and vacation rentals impossible or impracticable.

24. Despite Plaintiffs' good faith in going forward with the purchase of the subject property, and their best efforts to ascertain and confirm whether or not they would be precluded from using the property for short-term and vacation rentals, they were essentially blindsided by the Defendants' failure to provide them with all HOA documents, in particular,

the single most important document, that being the Bay Colony Rules.

### Failure of Solomons to Attempt to Settle Contract Dispute through Mediation

25.    Paragraph 16 of the Contract, entitled, "DISPUTE RESOLUTION," provides, in relevant part, that "Unresolved controversies, claims and other matters in question between buyer and seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ('Dispute Resolution') will be settled as follows:…(b) Buyer and Seller shall attempt to settle disputes in an amicable manner through mediation pursuant to Florida Rules for Certified and Court-Appointed Mediations and Chapter 44, F.S., as amended (the 'Mediation Rules')…Disputes not settled pursuant to this Paragraph 16 may be resolved by instituting action in the appropriate court having jurisdiction of the matter…" However, notwithstanding Plaintiffs' attempts to amicably resolve their claim against the sellers (Solomons) arising out of the Contract, specifically by having their counsel contact the Solomons by letter, dated July 31, 2017, in which Plaintiffs fully apprised the Solomons of their claim under the Contract and attempted to arrange a mediation of the matter, the Solomons failed to respond in any manner, or to otherwise cooperate in having the matter resolved in mediation.  (Copy of said Letter, dated July 31, 2017, is attached hereto as Exhibit E).  Accordingly, Plaintiffs have instituted the within action in this Court.

### Recovery of Costs and Attorney's Fees Under the Contract

26.    Paragraph 17 of the Contract provides, in relevant part, that, "In any litigation permitted by this Contract, the prevailing party shall be entitled to recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the litigation."  Plaintiffs have retained the undersigned counsel to represent them in this matter, and have incurred, and will continue to incur, costs and fees, including attorney's

fees, in an attempt to vindicate their rights, and Plaintiff Travelpath Canada, as assignee of the Greggs' rights under the Contract, should it prevail in its claim against the Solomons, is entitled to recovery of all such costs and fees.

**Count I**
**(Plaintiff Travelpath Canada Against the Solomons**
**for Breach of Written Contract)**

27.     Plaintiff Travelpath Canada realleges and incorporates paragraphs 1 through 24 above as though fully set forth herein.

28.     Defendants IRA A. SOLOMON and HELENE SOLOMON (sellers) breached the Contract (Exhibit A hereto), specifically, paragraph 20 thereof, by failing to deliver a copy of the HOA documents to the buyers (the Greggs) via the sellers' broker (or otherwise), within 5 days of the Effective Date of the Contract.  The HOA documents provided to the Greggs (Plaintiff Travelpath Canada's assignors) were missing the Bay Colony Rules, as more specifically alleged hereinabove.  Moreover, the Solomons failed to provide a full set of the HOA documents to Plaintiff Travelpath Canada, at any time whatsoever, either before or after the closing on the subject property.

29.     As assignee of the buyers (the Greggs), pursuant to the written assignment of June 15, 2015 (Exhibit D hereto), Travelpath Canada became the transferee, owner and successor in interest to all rights possessed by the Greggs under the Contract.

30.     As a proximate result of the Solomons' Breach of the Contract, Plaintiff Travelpath Canada, has sustained, and continued to sustain damages, for which they are entitled to recovery from the Solomons.  Such damages include, but not limited to, sums expended on renovations, repairs, improvements and maintenance of the Compass Isle

Property, real estate taxes and insurance, furnishings for the home thereon, costs associated with financing, closing costs, loss of use, lost profits, and lost opportunity costs, with such damages collectively totaling over $1,000,000.00, and according to proof. All of said damages flowed foreseeably from the breach. The Solomons are jointly and severally liable to Travelpath Canada for such damages.

31.   If Plaintiff Travelpath Canada prevails on its Breach of Contract claim, it is entitled to recover costs and fees, including reasonable attorney's fees, from the Solomons, pursuant to paragraph 17 of the Contract.

**WHEREFORE** Plaintiff Travelpath Canada prays for relief as follows against the Solomons:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Costs and Expenses of Suit;

(c) Reasonable Attorney's Fees; and

(d) Such other and further relief that the Court may deem proper and just.

### Count II
### (Plaintiffs Christopher and Diane Gregg Against Defendant Carol Dudley for Negligence Based on Breach of Statutory Duty Owed to Plaintiffs as Transaction Broker Pursuant to Fla. Stat. § 475.278)

32.   Plaintiffs Christopher and Diane Gregg reallege and incorporate paragraphs 1 through 24 above as though fully set forth herein.

33.   Pursuant to section 475.278(1)(b), Florida Statutes, "It shall be presumed that all licensees are operating as transaction brokers unless a single agent or no brokerage relationship is established, in writing, with a customer." At all times material to this claim, Defendant Dudley was representing Plaintiffs Christopher and Diane Gregg as a transaction

broker within the meaning of the statute, as no single agent or no brokerage relationship was established, in writing, with Plaintiffs.

34. Pursuant to Fla. Stat. § 475.278(2), the duties of Defendant Dudley to the Greggs in her capacity as transaction broker in connection with the purchase and sale of the Compass Isle Property included using "skill, care, and diligence in the transaction."

35. Defendant Dudley knew that a primary purpose for the Greggs' acquisition of the Compass Isle Property was to use it for short term and vacation rentals, and that it was vital to the Greggs that there were no rules and/or requirements that would prohibit, restrict or impede such use. Plaintiffs were emphatic in informing Defendant that they needed confirmation that "**all** of the HOA documents have been sent to us." (See March 24, 2015 e-mail from Christopher Gregg to Defendant Dudley and Rick Balistreri, Composite B hereto) (emphasis in original). The Greggs made it unequivocally clear to Defendant Dudley that they were proceeding in good faith that there were no HOA documents that could have an impact on paying and non-paying guests from accessing and occupying the premises at 2 Compass Isle. (*Id.*). Given these facts, and otherwise given her statutory duty to act with skill, care and diligence in the transaction, Defendant had a duty to provide to the Greggs any and all HOA documents rules, including documents containing rules, requirements and/or restrictions that would impact the intended use of the property for rental purposes. Defendant had a duty to make a reasonable investigation into the HOA documents and to specifically determine whether there were any rules that could impact the intended use of the property, and/or to carefully review the HOA documents that she was providing to the Greggs to determine whether, in fact, the HOA Rules were included. A reasonably competent broker and/or realtor engaged in the business of representing buyers in the

acquisition of residential property in the State of Florida, particularly residential property within a planned community governed by a homeowners' association, would know, or certainly should know, that HOA documents include Rules of the association that are binding upon the owners.

36.   Despite such knowledge, and her knowledge that the Greggs were deeply concerned about the existence of any HOA documents that could impact rentals of the property, Defendant Dudley breached her duty to exercise skill, care and diligence in the following ways:

(1) Failing to make a reasonable investigation or inquiry to determine whether or not there existed any HOA Rules that would have an impact upon rentals of the subject property;

(2) Failing to ensure that the HOA documents she provided to the Greggs were comprised of all the HOA documents; and/or

(3) Failing to carefully review the HOA documents she was providing to the Greggs to ensure that such documents included the HOA (Bay Colony) Rules.

37.   It was reasonably foreseeable to Defendant Dudley that her breach of duty to exercise skill, care and diligence (i.e. negligence) would create in the Greggs a false sense of security as to the ability to utilize the property for short term and vacation rentals without restrictions thereon, and would induce them to go forward with, or to authorize, the purchase of the property, and but for Defendant's negligence, they would not have done so. Defendant Dudley's failure to exercise skill, care and diligence resulted in the Greggs making substantial expenditures and incurring significant lost revenues and other financial losses in connection with the property that they would not have otherwise made or incurred.

38.     As a foreseeable and proximate result of Defendant Dudley's negligence, the Greggs have sustained, and continue to sustain, damages, including, but not limited to, expenses for renovations, repairs, improvements and maintenance on the subject property, furnishings for the home thereon, real estate taxes and insurance, closing costs, costs associated with financing, lost opportunity costs on personal funds expended, diminution in value of the property, and lost profits, with such damages collectively totaling over $1,000,000.00, and according to proof.

39.     Defendant Dudley's conduct, as more particularly alleged hereunder, constituted "gross negligence" within the meaning of section 768.72(2)(b), Florida Statutes, as such conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Greggs, who were exposed to such conduct. Accordingly, the Greggs are entitled to recovery of punitive damages from Defendant.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for the following relief against Defendant Dudley:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Punitive Damages;

(c) Costs and Expenses of Suit; and

(d) Such other and further relief that the Court may deem proper and just.

### Count III
### (Plaintiffs Christopher and Diane Gregg Against Defendant Balistreri Realty for Vicarious Liability Based on Defendant Dudley's Negligence/Breach of Statutory Duty to the Greggs)

40.     Plaintiffs Christopher and Diane Gregg reallege paragraphs 1 through 24 and paragraphs 33 through 39 above, as though fully set forth herein.

41.     At all times material, Defendant Dudley was an agent and/or employee of Defendant Balistreri Realty, and was acting within the course and scope of such agency and/or employment.  Accordingly, Defendant Balistreri Realty is vicariously liable to the Greggs, under the doctrine of *respondeat superior*, for the damages proximately caused to them as a result of Defendant Dudley's Negligence/Breach of Statutory Duty under section 475.278(1)(b), Florida Statutes, as more particularly alleged in Count II, above, and is jointly and severally liable with Defendant Dudley for such damages.

42.     Further, given Defendant Dudley's commission of "gross negligence," as defined by section 768.72(2)(b), Florida Statutes, and further given that there was some fault amounting to at least negligence on the part of Defendant Balistreri Realty, itself, Defendant Balistreri is vicariously liable to the Greggs for punitive damages.  As alleged, the Greggs' March 24, 2015 e-mail specifically included Rick Balistreri, officer and/or principal and/or owner of Defendant Balistreri, thus placing Defendant Balistreri Realty on notice that the Greggs were seeking all HOA documents and confirmation that they had received same, yet said Defendant failed to exercise reasonable care to ensure that the Greggs received all such documents, including the Bay Colony Rules.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for the following relief against Defendant Balistreri Realty:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Punitive Damages;

(c) Costs and Expenses of Suit; and

(d) Such other and further relief that the Court may deem proper and just.

**Count IV**

**(Plaintiff Travelpath Canada Against Defendant Carol Dudley for Negligence
Based on Breach of Statutory Duty Owed to Plaintiffs as Transaction Broker
Pursuant to Fla. Stat. § 475.278)**

43.     Plaintiff Travelpath realleges and incorporates paragraphs 1 through 24 as though fully set forth herein.

44.     Once the Greggs assigned their rights under the Contract to Plaintiff Travelpath Canada, Defendant Dudley became the transaction broker on behalf of Travelpath Canada.

45.     Pursuant to section 475.278(1)(b), Florida Statutes, "It shall be presumed that all licensees are operating as transaction brokers unless a single agent or no brokerage relationship is established, in writing, with a customer."  At all times material to this claim, Defendant Dudley was representing Plaintiff Travelpath Canada as a transaction broker within the meaning of the statute, as no single agent or no brokerage relationship was established, in writing, with Plaintiffs.

46.     Pursuant to Fla. Stat. § 475.278(2), the duties of Defendant Dudley to Plaintiff Travelpath Canada in her capacity as transaction broker in connection with the purchase and sale of the Compass Isle Property included using "skill, care, and diligence in the transaction."

47.     Defendant Dudley knew that a primary purpose for Travelpath Canada's acquisition of the Compass Isle Property was to use it for short term and vacation rentals. Christopher Gregg, owner and President of Travelpath Canada, was emphatic in informing Defendant that confirmation that "**all** of the HOA documents" had been provided was needed.  This e-mail made it unequivocally clear to Defendant Dudley that they were

17

proceeding in good faith that there were no HOA documents that could have an impact on paying and non-paying guests from accessing and occupying the premises at 2 Compass Isle. (*Id.*). Further, it was stated in said e-mail that, "After a review of the HOA documents provided by Carol [Dudley] on Mar. 21 we have been advised there is no clause prohibiting paying and non-paying guests from occupying the premises at 2 Compass Isle under the ownership of the Greggs *or an assigned company*. Diane [Gregg] has requested confirmation that **all** of the HOA documents have been sent to us." (see Composite Exhibit B hereto) (emphasis supplied). Given these facts, Defendant Dudley had a duty to provide to Travelpath Canada any and all HOA documents rules, requirements and/or restrictions that would impact the intended use of the property for rental purposes. Defendant had a duty to make a reasonable investigation into the HOA documents and to specifically determine whether there were any rules that could impact the intended use of the property, and/or to carefully review the HOA documents to determine whether, in fact, the HOA Rules were included. A reasonably competent broker and/or realtor engaged in the business of representing buyers in the acquisition of residential property in the State of Florida, particularly residential property within a planned community governed by a homeowners' association, would know, or certainly should know, that HOA documents include Rules of the association that are binding upon the owners.

48.     Despite such knowledge, and her knowledge that Travelpath Canada's owners and its President, Christopher Gregg, were deeply concerned about the existence of any HOA documents that could impact rentals of the property, Defendant Dudley breached her duty to Plaintiff Travelpath Canada to exercise skill, care and diligence in failing to provide Plaintiff with the full HOA documents prior to the closing, or at any time thereafter; and/or in failing

to make a reasonable investigation or inquiry to determine whether or not there existed any HOA Rules that would have an impact upon rentals of the subject property; and/or in failing to ensure that the HOA documents she had provided to Travelpath Canada's owners and predecessor in interest, the Greggs, were comprised of all the HOA documents; and/or in failing to carefully review the HOA documents to ensure that such documents included the HOA (Bay Colony) Rules.

49.     It was reasonably foreseeable to Defendant Dudley that her breach of duty to exercise skill, care and diligence (i.e. negligence), as more particularly alleged above, would induce Plaintiff Travelpath Canada to go forward with the closing and purchase the subject property, whereas, if Travelpath Canada had learned of the Bay Colony Rule impacting rentals, it would not have done so, and Defendant's negligence further induced Travelpath Canada to make substantial expenditures and incur significant lost revenues and other financial losses that it would not have otherwise made or incurred.

50.     As a foreseeable and proximate result of Defendant Dudley's negligence, Plaintiff Travelpath Canada has sustained, and continues to sustain, damages, including, but not limited to, expenses for renovations, repairs, improvements and maintenance on the subject property, furnishings for the home thereon, real estate taxes and insurance, closing costs, costs associated with financing, lost opportunity costs on personal funds expended, diminution in value of the property, and lost profits, with such damages collectively totaling over $1,000,000.00, and according to proof.

51.     Defendant Dudley's conduct, as more particularly alleged hereunder, constituted "gross negligence" within the meaning of section 768.72(2)(b), Florida Statutes, as such conduct was so reckless or wanting in care that it constituted a conscious disregard or

indifference to the rights of Travelpath Canada, which was exposed to such conduct. Accordingly, Plaintiff is entitled to recovery of punitive damages from Defendant.

**WHEREFORE** Plaintiff Travelpath Canada prays for the following relief against Defendant Dudley:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Punitive Damages;

(c) Costs and Expenses of Suit; and

(d) Such other and further relief that the Court may deem proper and just.

**Count V**
**(Plaintiff Travelpath Canada Against Defendant Balistreri Realty for Vicarious Liability Based on Defendant Dudley's Negligence/Breach of Statutory Duty to Travelpath Canada)**

52.     Plaintiff Travelpath Canada realleges paragraphs 1 through 24 and paragraphs 44 through 51 above, as though fully set forth herein.

53.     At all times material, Defendant Dudley was an agent and/or employee of Defendant Balistreri Realty, and was acting within the course and scope of such agency and/or employment.   Accordingly, Defendant Balistreri Realty is vicariously liable to Plaintiff Travelpath Canada, under the doctrine of *respondeat superior*, for the damages proximately caused to Plaintiff as a result of Defendant Dudley's Negligence/Breach of Statutory Duty under section 475.278(1)(b), Florida Statutes, as more particularly alleged in Count IV, above, and is jointly and severally liable with Defendant Dudley for such damages.

54.     Further, given Defendant Dudley's commission of "gross negligence," as defined by section 768.72(2)(b), Florida Statutes, and further given that there was some fault

amounting to at least negligence on the part of Defendant Balistreri Realty, itself, Defendant Balistreri is vicariously liable to Travelpath Canada for punitive damages. As alleged, the March 24, 2015 e-mail from Travelpath Canada's owner and President, Christopher Gregg, specifically included as a recipient Rick Balistreri, officer and/or principal and/or owner of Defendant Balistreri Realty, thus placing Defendant Balistreri Realty on notice that the Greggs were seeking all HOA documents and confirmation that they had received same, yet said Defendant failed to exercise reasonable care to ensure that the Greggs received all such documents, including the Bay Colony Rules.

**WHEREFORE** Plaintiff Travelpath Canada prays for the following relief against Defendant Balistreri Realty:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Punitive Damages;

(c) Costs and Expenses of Suit; and

(d) Such other and further relief that the Court may deem proper and just.

### Count VI
**(Plaintiffs Christopher and Diane Gregg Against Defendant Carol Dudley for Negligent Misrepresentation)**

55.    Plaintiffs Christopher and Diane Gregg reallege and incorporate paragraphs 1 through 24 above, as though fully set forth herein.

56.    In an e-mail sent on March 24, 2015, Defendant Dudley made a false statement or misrepresentation of a material fact to the Greggs, specifically, the statement, "Everything Jil [Shapiro] sent me and I forwarded to you were the **FULL HOA** docs." (see Defendant Dudley's March 24, 2015 e-mail to the Greggs, Composite Exhibit B hereto) (emphasis in original).

57.     At the time that false statement or misrepresentation was made, Defendant Dudley was without knowledge as to its truth or falsity, or it was made under circumstances in which Defendant ought to have known it was false, even if she did not, in fact, know of the falsity thereof.

58.     The false statement or misrepresentation was intended to induce the Greggs to act in reliance thereon, specifically to go forward with the purchase, or to authorize the purchase of, and closing on, the subject property, unfettered by any concerns as to rules, restrictions, and/or requirements impacting rentals of the property.

59.     In justifiable reliance on Defendant Dudley's false statement or misrepresentation, the Greggs proceeded toward a closing and did not withdraw from the Contract and, approximately two months following Defendant's false statement or misrepresentation, the Greggs assigned their rights under the Contract to Plaintiff Travelpath Canada, and, as officers of Travelpath Canada (Christopher Gregg being President thereof) and owners of all beneficial interest in the company, they authorized Travelpath Canada to accept the assignment and to proceed to closing on the Compass Isle Property.  Although Defendant Dudley failed to provide them with the Bay Colony Rules, the Greggs justifiably believed they had received all HOA documents and that there were thus no impediments to the intended use of the subject property for short term and vacation rentals.

60.     As a proximate result of Defendant Dudley's negligent misrepresentation, the Greggs sustained damages, including, but not limited to, expenses for renovations, repairs, improvements and maintenance on the subject property, furnishings for the home thereon, real estate taxes and insurance, closing costs, costs associated with financing, lost opportunity costs on personal funds expended, diminution in value of the property, and lost

profits, with such damages collectively totaling over $1,000,000.00, and according to proof.

61.    Defendant Dudley's conduct, as more particularly alleged hereunder, constituted "gross negligence," as defined by section 768.72(2)(b), Florida Statutes, as such conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Greggs, who were exposed to such conduct. Accordingly, Defendant seeks recovery of punitive damages from said Defendant.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for the following relief against Defendant Dudley:

(a)  Damages in the amount of $1,000,000.00, or according to proof;

(b)  Punitive Damages;

(c)  Costs and Expenses of suit; and

(d)  Such other and further relief that the Court may deem proper and just.

### Count VII
**(Plaintiffs Christopher and Diane Gregg Against Defendant Balistreri Realty for Vicarious Liability Based on Defendant Dudley's Negligent Misrepresentation)**

62.    Plaintiffs Christopher and Diane Gregg reallege paragraphs 1 through 24 and paragraphs 56 through 61 above, as though fully set forth herein.

63.    At all times material, Defendant Dudley was an agent and/or employee of Defendant Balistreri Realty, and was acting within the course and scope of such agency and/or employment. Accordingly, Defendant Balistreri Realty is vicariously liable to the Greggs, under the doctrine of *respondeat superior*, for the damages proximately caused to them as a result of Defendant Dudley's negligent misrepresentation, as more particularly alleged in Count VI, above, and is jointly and severally liable with Defendant Dudley for

such damages.

64.     Further, given Defendant Dudley's commission of "gross negligence" within the meaning of section 768.72(2)(b), Florida Statutes, in connection with her negligent misrepresentation to the Greggs, and further given that there was some fault amounting to at least negligence on the part of Defendant Balistreri Realty, itself, said Defendant is vicariously liable to the Greggs for punitive damages. As alleged, the Greggs' March 24, 2015 e-mail specifically included Rick Balistreri, officer and/or principal and/or owner of Defendant Balistreri Realty, thus placing Defendant Balistreri Realty on notice that the Greggs were seeking all HOA documents and confirmation that they had received same, yet Defendant Balistreri Realty failed to exercise reasonable care to ensure that the Greggs received all such documents, including the Bay Colony Rules.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for the following relief against Defendant Balistreri Realty:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Punitive Damages;

(c) Costs and Expenses of Suit; and

(d) Such other and further relief that the Court may deem proper and just.

### Count VIII
### (Plaintiffs Christopher and Diane Gregg Against Defendant Jil Shapiro for Negligent Misrepresentation)

65.     Plaintiffs Christopher and Diane Gregg reallege paragraphs 1 through 24 above, as though fully set forth herein.

24

66.     As a licensed real estate broker and salesperson involved in the subject transaction, under Florida law, Defendant Shapiro owed the Greggs a duty of candor, fair-dealing and competency, even in the absence of any principal-agent relationship between her and the Greggs. Further, she owed the Greggs a duty to exercise the kind of care that would be exercised by a reasonably prudent realtor under the circumstances surrounding the transaction between her clients (the Shapiros) and the Greggs, so as not to expose the Greggs to unreasonable and foreseeable risk of harm or damage.

67.     Plaintiffs are informed and believe, and on that basis allege that, at all times material, Defendant Shapiro was, herself, a homeowner and resident in the subject Bay Colony subdivision, and that, in fact, her home was in very close proximity to the subject Compass Isle Property. Plaintiffs are further informed and believe, and on that basis allege, that at all times material, Defendant Shapiro's husband was on the Bay Colony Board of Directors. Given these facts, Defendant Shapiro, even independent of her role in the subject transaction involving the Greggs, was likely, if not certain, to be familiar with the Bay Colony Rules, including the requirements and restrictions encompassed within Rule 11 of said Rules.

68.     As more particularly shown by the March 24, 2015 e-mail from Defendant Dudley to the Greggs, Defendant Shapiro made a false statement or misrepresentation of material fact to the the broker/buyer's agent representing the Greggs (to wit, Defendant Dudley), that she (Defendant Shapiro) had provided the full HOA documents. The March 24, 2015 e-mail from Defendant Dudley to the Greggs, relaying to the Greggs Defendant Shapiro's said representation, was written almost immediately after a "long chat" had ensued between Defendants Dudley and Shapiro, and it was implied in the e-mail that Ms. Dudley

had conveyed to Defendant Shapiro the Greggs' deep concerns regarding whether they had been provided all HOA documents, their need for confirmation thereof, and in particular, their concerns over whether there were any documents that could impact rentals of the subject property. (See Composite Exhibit B hereto)

69.     It was reasonably foreseeable to Defendant Shapiro that Defendant Dudley, as agent for the Greggs and representing the Greggs in the transaction, would relay to the Greggs what she had been told by Defendant Shapiro, to wit, that the documents being provided to the Greggs were the full HOA documents. It was further reasonably foreseeable to Defendant Shapiro that the Greggs would rely on her representation that the documents being provided were the full HOA documents.

70.     At the time Defendant Shapiro made the false statement or misrepresentation of fact concerning the HOA documents she had provided being the full HOA documents, Defendant was without knowledge as to its truth or falsity, or it was made under circumstances in which she ought to have known it was false, even if she did not, in fact, know of the falsity thereof.

71.     The aforesaid false statement or misrepresentation made by Defendant Shapiro to the Greggs' agent was intended to induce the Greggs to act in reliance thereon, specifically to go forward with the purchase, or to authorize the purchase of, and closing on, the subject property, unfettered by any concerns as to rules, restrictions, and/or requirements impacting rentals of the property.

72.     In justifiable reliance on Defendant Shapiro's representation, the Greggs continued to proceed further in the transaction and toward a closing on the subject property, whereas the Greggs would have withdrawn from the Contract had they known the true facts

26

concerning the HOA documents, and further, approximately two months following Defendant Shapiro's misrepresentation, the Greggs assigned their rights under the Contract to Plaintiff Travelpath Canada, and, as owner and President of Travelpath Canada, Christopher Gregg, authorized Travelpath Canada to accept the assignment and to proceed to closing on the Compass Isle Property. Although Defendant Shapiro failed to provide them with the Bay Colony Rules, the Greggs justifiably believed they had received all HOA documents and that there were thus no impediments to the intended use of the subject property for short term and vacation rentals.

73. As a proximate result of Defendant Shapiro's negligent misrepresentation, the Greggs sustained damages, including, but not limited to, expenses for renovations, repairs, improvements and maintenance on the subject property, furnishings for the home thereon, real estate taxes and insurance, closing costs, costs associated with financing, lost opportunity costs on personal funds expended, diminution in value of the property, and lost profits, with such damages collectively totaling over $1,000,000.00, and according to proof.

74. Defendant Shapiro's conduct, as more particularly alleged hereunder, constituted "gross negligence," as defined by section 768.72(2)(b), Florida Statutes, as such conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Greggs, who were exposed to such conduct. Accordingly, Defendant seeks recovery of punitive damages from said Defendant.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for relief against Defendant Shapiro as follows:

(a) Damages in the amount of $1,000,000.0, or according to proof;

(b) Punitive Damages;

27

(c) Costs and Expenses of Suit; and

(d) Such other and further relief that the Court may deem proper and just.

## Count IX
### (Plaintiffs Christopher and Diane Gregg Against Defendant Realty World South Florida for Vicarious Liability Based on Defendant Shapiro's Negligent Misrepresentation)

75.     Plaintiffs Christopher and Diane Gregg reallege and incorporate paragraphs 1 through 24 and 66 through 73 above, as though fully set forth herein.

76.     At all times material, Defendant Shapiro was an agent and/or employee of Defendant Realty World South Florida, and was acting within the course and scope of such agency and/or employment.   Accordingly, Defendant Realty World South Florida is vicariously liable to the Greggs, under the doctrine of *respondeat superior*, for the damages proximately caused to them as a result of Defendant Shapiro's negligent misrepresentation, as more particularly alleged in Count VI, above, and is jointly and severally liable with Defendant Shapiro for such damages.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for relief against Defendant Realty World South Florida as follows:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Costs and Expenses of Suit; and

(c) Such other and further relief that the Court may deem proper and just.

## Count X
### (Plaintiffs Christopher and Diane Gregg Against Defendant Jil Shapiro for Negligence)

77.     Plaintiffs Christopher and Diane Gregg reallege paragraphs 1 through 24 and

paragraphs 66 and 67 above, as though fully set forth herein.

78. Defendant Shapiro owed the Greggs a duty to exercise reasonable care, and specifically, to exercise the kind of care and prudence that would be exercised by reasonably prudent brokers and/or realtors in the same or similar community, and under the same or similar circumstances such as those surrounding the subject sale and purchase transaction. At all times material, Defendant Shapiro knew that a primary purpose of the Greggs for purchase of the subject property would be for the Greggs and/or its company's use of the property for short term and vacation rentals to friends, clients and/or business associates. Further, Defendant knew that it was critical for the Greggs to be provided all HOA documents, and that they sought confirmation of same. As noted hereinabove, even after Defendant Shapiro provided what were allegedly all HOA documents to Defendant Dudley, the Greggs' agent, Ms. Dudley, asked Ms. Shapiro "to double check and to send everything again so we do not miss anything at all." (See Composite B hereto).

79. Even absent any specific knowledge as to the Greggs' intended plans for the subject property, Defendant Shapiro, as broker for the sellers, had a duty to provide to the Greggs all HOA documents, or at minimum, she undertook such a duty when she provided HOA documents to the Greggs' agent, Defendant Dudley. Defendant had a duty to carefully review the HOA documents she was providing to the Greggs to determine whether, in fact, the HOA Rules were included. A reasonably competent broker or realtor engaged in transactions involving the sale and purchase residential property in Broward County, Florida, particularly residential property within a planned community governed by a homeowners' association, would know that HOA documents include Rules of the association that are binding upon the owners. This is especially the case where, as here, Defendant Shapiro,

29

herself, was a homeowner and resident in the subject Bay Colony community.

80.    Defendant Shapiro breached her duty to the Greggs to exercise reasonable care, and was thus negligent, in failing to provide the Greggs or their agent with the full HOA documents at any time after execution of the Contract, or prior to the closing, or at any time thereafter, and/or in failing to carefully review the HOA documents she provided to ensure that such documents included the HOA (Bay Colony) Rules.

81.    It was reasonably foreseeable to Defendant Shapiro that her negligence would induce the Greggs to proceed with the purchase and closing on the subject property, or to authorize their company and assignee, Travelpath Canada, to do so, and but for Defendant Shapiro's negligence, Plaintiffs would not have done so.  Defendant Shapiro's breach of duty further resulted in the Greggs making substantial expenditures and incurring significant lost revenues and other financial losses in connection with the subject property that they would not have otherwise made or incurred.

82.    As a foreseeable and proximate result of Defendant Shapiro's negligence, the Greggs have sustained damages, including, but not limited to, expenses for renovations, repairs, improvements and maintenance on the subject property, furnishings for the home thereon, real estate taxes and insurance, closing costs, costs associated with financing, lost opportunity costs on personal funds expended, diminution in value of the property, and lost profits, with such damages collectively totaling over $1,000,000.00, and according to proof.

83.    Defendant Shapiro's conduct, as more particularly alleged hereunder, constituted "gross negligence" within the meaning of section 768.72(2)(b), Florida Statutes, as such conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Greggs, who were exposed to such conduct.  Accordingly,

Plaintiff is entitled to recovery of punitive damages from said Defendant.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for relief against Defendant Shapiro as follows:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Punitive Damages;

(c) Costs and Expenses of Suit; and

(d) Such other and further relief that the Court may deem proper and just.

### Count XI
**(Plaintiffs Christopher and Diane Gregg Against Defendant Realty World South Florida for Vicarious Liability Based on Defendant Shapiro's Negligence)**

84.     Plaintiffs Christopher and Diane Gregg reallege and incorporate paragraphs 1 through 24 and 78 through 82 above, as though fully set forth herein.

85.     At all times material, Defendant Shapiro was an agent and/or employee of Defendant Realty World South Florida, and was acting within the course and scope of such agency and/or employment.   Accordingly, Defendant Realty World South Florida is vicariously liable to the Greggs, under the doctrine of *respondeat superior*, for the damages proximately caused to them as a result of Defendant Shapiro's negligence, as more particularly alleged in Count VIII, above, and is jointly and severally liable with Defendant Shapiro for such damages.

**WHEREFORE** Plaintiffs Christopher and Diane Gregg pray for relief against Defendant Realty World South Florida as follows:

(a) Damages in the amount of $1,000,000.00, or according to proof;

(b) Costs and Expenses of Suit; and

(c) Such other and further relief that the Court may deem proper and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all claims and issues so triable.

Respectfully submitted,

/s/ Michael L. Feinstein
Michael L. Feinstein, Esquire

MICHAEL L. FEINSTEIN, P.A.
200 SE 18th Court
Fort Lauderdale, FL 33316
Telephone: (954) 767-9662
Facsimile: (954) 764-4502
Michael@feinsteinlaw.net

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that this Complaint for Damages was furnished to a process server on this 29th day of January, 2018 for service upon Defendants.

/s/ Michael L. Feinstein
Michael L. Feinstein, P.A.

# EXHIBIT A

Mar 20 15 02:26p   Adam Shapiro                      9544923792            p.2



# "AS IS" Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR      **FloridaRealtors**

1*   **PARTIES:**_____ **IRA A SOLOMON** and **HELENE SOLOMON, HUSBAND AND WIFE**_____ ("Seller"),
2*   and_____ **CHRISTOPHER GREGG** and **DIANE GREGG, HUSBAND AND WIFE**_____ ("Buyer"),
3   agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4   (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase and
5   any riders and addenda ("Contract"):
6   **1.  PROPERTY DESCRIPTION:**
7*      (a) Street address, city, zip: __ **2** __ **COMPASS ISLE** __ **FT. LAUDERDALE FL** __ **33308**
8*      (b) Property is located in: __ **BROWARD** __ County, Florida. Real Property Tax ID No.: __ **4943-07-08-0540**
9*      (c) Real Property: The legal description is
10         **BAY COLONY SECTION OF THE LANDINGS 62-34 B, LOT 54,55 LESS PT DESC AS, COMM**
11         **AT NE COR OF LOT 55, SWLY ALG E/L 125, NWLY 63.04, NLY 126.08 TO PT**
12         together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and attached
13         wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or by other terms
14         of this Contract.
15      (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items which
16         are owned by Seller and existing on the Property as of the date of the initial offer are included in the purchase:
17         range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s), drapery rods and
18         draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate and other access
19         devices, and storm shutters/panels ("Personal Property").
20*         Other Personal Property items included in this purchase are: **OUTSIDE PATIO AND LANAI FURNITURE**
21         _____
22         Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23*      (e) The following items are excluded from the purchase: _____
24

25                                **PURCHASE PRICE AND CLOSING**
26*   **2.  PURCHASE PRICE (U.S. currency):** ......................................................... $ **2,785,000.00**
27*      (a) Initial deposit to be held in escrow in the amount of (checks subject to COLLECTION) ............ $ **139,250.00**
28         The initial deposit made payable and delivered to "Escrow Agent" named below
29         (CHECK ONE): (i) ☐ accompanies offer or (ii) ☐ is to be made within ____ (if left blank,
30         then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN OPTION (ii)
31         SHALL BE DEEMED SELECTED.
32*         Escrow Agent Information: Name: __ **INTEGRITY TITLE**
33*         Address: **1356 N FEDERAL HWY, POMPANO BEACH, FL 33062**
34*         Phone: __ **954-691-1950** __ E-mail: **DPEARSON@INTEGRITYTITLECO.COM** Fax __ **954-691-1951**
35*      (b) Additional deposit to be delivered to Escrow Agent within __ **15** __ (if left blank, then 10)
36*         days after Effective Date ................................................................ $ **139,250.00**
37         (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38*      (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8 .............
39*      (d) Other: ........................................................................... $ _____
40      (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41*         transfer or other COLLECTED funds ...................................................... $ **2506500.00**
42         NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.
43   **3.  TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44*      (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before _____
45*         **03/20/15** ____ , this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46         Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day the
47         counter-offer is delivered.
48      (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or initialed
49         and delivered this offer or final counter-offer ("Effective Date").
50   **4.  CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur and
51      the closing documents required to be furnished by each party pursuant to this Contract shall be delivered ("Closing") on
52*      __ **ON OR BEFORE 06/15/15.** __ ("Closing Date"), at the time established by the Closing Agent.
53   **5.  EXTENSION OF CLOSING DATE:**
54      (b) If Closing funds from Buyer's lender(s) are not available at time of Closing due to Truth in Lending Act (TILA) notice
55         requirements, Closing shall be extended for such period necessary to satisfy TILA notice requirements, not to
56*         exceed 7 days.

Buyer's Initials _____                      Page 1 of 11                  Seller's Initials _____

FloridaRealtors/FloridaBar-ASIS-3  Rev.9/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 1] www.transactiondesk.com.

Mar 20 15 02:27p        Adam Shapiro                                    9544923792                              p.3

57     (b)  If extreme weather or other condition or event constituting "Force Majeure" (see STANDARD G) causes: (i)
58          disruption of utilities or other services essential for Closing or (ii) Hazard, Wind, Flood or Homeowners' insurance,
59          to become unavailable prior to Closing, Closing shall be extended a reasonable time up to 3 days after restoration
60          of utilities and other services essential to Closing and availability of applicable Hazard, Wind, Flood or
61          Homeowners' Insurance. If restoration of such utilities or services and availability of insurance has not occurred
62          within _____ (If left blank, then 14) days after Closing Date, then either party may terminate this Contract by
63          delivering written notice to the other party, and Buyer shall be refunded the Deposit, thereby releasing Buyer and
64          Seller from all further obligations under this Contract.

65  6.  OCCUPANCY AND POSSESSION:
66     (a)  Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the
67          Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all
68          personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and
69          codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the
70          Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be
71          deemed to have accepted the Property in its existing condition as of time of taking occupancy.
72     (b)  ☐ CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING. If Property is
73          subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts
74          and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be
75          delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the
76          lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of
77          written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be
78          refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel
79          Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied
80          by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.
81  7.  ASSIGNABILITY: (CHECK ONE): Buyer ☐ may assign and thereby be released from any further liability under this
82     Contract; ☒ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

83                                              **FINANCING**

84  8.  FINANCING:
85     ☒ (a) Buyer will pay cash or may obtain a loan for the purchase of the Property. There is no financing contingency to
86     Buyer's obligation to close.
87     ☐ (b) This Contract is contingent upon Buyer obtaining a written loan commitment for a ☐ conventional ☐ FHA ☐ VA
88     or ☐ other _____ (describe) loan on the following terms within _____ (if left blank, then 30) days after
89     Effective Date ("Loan Commitment Date") for (CHECK ONE): ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate loan in
90     the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _____ % (if left blank, then prevailing
91     rate based upon Buyer's creditworthiness), and for a term of _____ (if left blank, then 30) years ("Financing").

92     Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective
93     Date and use good faith and diligent effort to obtain a written loan commitment for the Financing ("Loan Commitment")
94     and thereafter to close this Contract. Buyer shall keep Seller and Buyer fully informed about the status of mortgage
95     loan application and Loan Commitment and authorizes Buyer's mortgage broker and Buyer's lender to disclose such
96     status and progress to Seller and Broker.

97
98     Upon Buyer's receipt of Loan Commitment, Buyer shall provide written notice of same to Seller. If Buyer does not
99     receive Loan Commitment by Loan Commitment Date, then thereafter either party may cancel this Contract up to the
100    earlier of:
101                    (i.)  Buyer's delivery of written notice to Seller that Buyer has either received Loan Commitment or elected
102                          to waive the financing contingency of this Contract; or
103                    (ii.)  7 days prior to Closing Date.

104    If either party timely cancels this Contract pursuant to this Paragraph 8 and Buyer is not in default under the terms of
105    this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under
106    this Contract. If neither party has timely canceled this Contract pursuant to this Paragraph 8, then this financing
107    contingency shall be deemed waived by Buyer.

108    If Buyer delivers written notice of receipt of Loan Commitment to Seller and this Contract does not thereafter close, the
109    Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's default; (2) Property related conditions of the
110    Loan Commitment have not been met (except when such conditions are waived by other provisions of this Contract); (3)
111    appraisal of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Commitment; or (4) the
112    loan is not funded due to financial failure of Buyer's lender, in which event(s) the Deposit shall be returned to Buyer,
113    thereby releasing Buyer and Seller from all further obligations under this Contract.

Buyer's Initials _____ _____            Page 2 of 11            Seller's Initials _____ _____
FloridaRealtors/FloridaBar-ASIS-3   Rev.9/14 © 2014 Florida Realtors® and The Florida Bar.  All rights reserved.

This software is licensed to [Jim Ballestreri - Ballestreri Realty Inc 1] www.transactiondesk.com.

114* ☐ (c) Assumption of existing mortgage (see rider for terms).
115* ☐ (d) Purchase money note and mortgage to Seller (see riders, addenda; or special clauses for terms).

116    **CLOSING COSTS, FEES AND CHARGES**

117 **9.** **CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
118    **(a) COSTS TO BE PAID BY SELLER:**
119    • Documentary stamp taxes and surtax on deed, if any                    • HOA/Condominium Association estoppel fees
120    • Owner's Policy and Charges (if Paragraph 9(c) (i) is checked)          • Recording and other fees needed to cure title
121    • Title search charges (if Paragraph 9(c) (iii) is checked)             • Seller's attorneys' fees
122* • Municipal lien search (if Paragraph 9(c) (i) or (iii) is checked)       • Other:_____
123       If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11 a
124       sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at Closing. If
125       actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay such actual
126       costs. Any unused portion of escrowed amount(s) shall be returned to Seller.
127    **(b) COSTS TO BE PAID BY BUYER:**
128    • Taxes and recording fees on notes and mortgages                       • Loan expenses
129    • Recording fees for deed and financing statements                      • Appraisal fees
130    • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked)          • Buyer's Inspections
131    • Survey (and elevation certification, if required)                     • Buyer's attorneys' fees
132    • Lender's title policy and endorsements                                • All property related insurance
133    • HOA/Condominium Association application/transfer fees                 • Owner's Policy Premium (if Paragraph
134    • Municipal lien search (if Paragraph 9(c) (ii) is checked)               9 (c) (iii) is checked.)
135* • Other:_____
136* **(c) TITLE EVIDENCE AND INSURANCE:** At least _____ (if left blank, then 5) days prior to Closing Date, a title
137       insurance commitment issued by a Florida licensed title insurer, with legible copies of instruments listed as
138       exceptions attached thereto ("Title Commitment") and, after Closing, an owner's policy of title insurance (see
139       STANDARD A for terms) shall be obtained and delivered to Buyer. If Seller has an owner's policy of title insurance
140       covering the Real Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
141       The owner's title policy premium, title search and closing services (collectively, "Owner's Policy and Charges") shall
142       be paid, as set forth below
143       (CHECK ONE):
144* ☐ (i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges (but not including charges for
145       closing services related to Buyer's lender's policy and endorsements and loan closing, which amounts shall be paid
146       by Buyer to Closing Agent or such other provider(s) as Buyer may select); or
147* ☐ (ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
148       services related to Buyer's lender's policy, endorsements, and loan closing; or
149* ☒ (iii) [MIAMI-DADE/BROWARD REGIONAL PROVISION]: Seller shall furnish a copy of a prior owner's policy of
150       title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence, which
151       is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C) municipal lien
152       search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's policy, and if
153*      applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____ (if left blank,
154       then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.
155    **(d) SURVEY:** At least 5 days prior to Closing, Buyer may, at Buyer's expense, have the Real Property surveyed and
156       certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real Property, a copy shall
157       be furnished to Buyer and Closing Agent within 5 days after Effective Date.
158* **(e) HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☒ N/A shall pay for a home warranty plan issued by
159* _____ at a cost not to exceed $_____. A home
160       warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
161       appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
162    **(f) SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
163       ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
164       ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
165       improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being imposed
166       on the Property before Closing. Buyer shall pay all other assessments. If special assessments may be paid in
167       installments (CHECK ONE):
168* ☒ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
169       Installments prepaid or due for the year of Closing shall be prorated.
170* ☐ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
171       IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.

Buyer's Initials _____ _____                    Page 3 of 11                    Seller's Initials _____ _____
Florida Realtors/Florida Bar-ASIS-3  Rev.8/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 3] www.transactiondesk.com.

173  This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district (CDD)
173  pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

174                                    DISCLOSURES

175  **10. DISCLOSURES:**
176     (a) RADON GAS: Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient
177        quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal
178        and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon
179        testing may be obtained from your county health department.
180     (b) PERMITS DISCLOSURE: Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
181        does not know of any improvements made to the Property which were made without required permits or made
182        pursuant to permits which have not been properly closed.
183     (c) MOLD: Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
184        desires additional information regarding mold, Buyer should contact an appropriate professional.
185     (d) FLOOD ZONE; ELEVATION CERTIFICATION: Buyer is advised to verify by elevation certificate which flood zone
186        the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to improving
187        the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area" or "Coastal
188        Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and Wildlife Service
189        under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and /or flood insurance
190        rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage through the National
191        Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer may terminate this
192        Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after Effective Date, and
193        Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this
194        Contract, failing which Buyer accepts existing elevation of buildings and flood zone designation of Property. The
195        National Flood Insurance Program may assess additional fees or adjust premiums for pre-Flood Insurance Rate
196        Map (pre-FIRM) non-primary structures (residential structures in which the insured or spouse does not reside for at
197        least 50% of the year) and an elevation certificate may be required for actuarial rating.
198     (e) ENERGY BROCHURE: Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
199        required by Section 553.996, F.S.
200     (f) LEAD-BASED PAINT: If Property includes pre-1978 residential housing, a lead-based paint disclosure is
201        mandatory.
202     (g) HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS
203        CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION/COMMUNITY
204        DISCLOSURE, IF APPLICABLE.
205     (h) PROPERTY TAX DISCLOSURE SUMMARY: BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT
206        PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO
207        PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY
208        IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER
209        PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY
210        PROPERTY APPRAISER'S OFFICE FOR INFORMATION.
211     (i) FIRPTA TAX WITHHOLDING: Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the
212        Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may
213        require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or
214        prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent
215        that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller
216        are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and
217        withholding requirements pursuant to FIRPTA.
218     (j) SELLER DISCLOSURE: Seller knows of no facts materially affecting the value of the Real Property which are not
219        readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence,
220        Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to
221        the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no
222        written or verbal notice from any governmental entity or agency as to a currently uncorrected building,
223        environmental or safety code violation.

224              PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS

225  **11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property,
226  including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS
227  Maintenance Requirement").

Buyer's Initials _____ _____                  Page 4 of 11                  Seller's Initials _____ _____
FloridaRealtors/FloridaBar-ASIS-3   Rev.9/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 1] www.transactiondesk.com.

Mar 20 15 02:28p      Adam Shapiro                    9544923792                      p.6

12. **PROPERTY INSPECTION; RIGHT TO CANCEL:**

   (a) **PROPERTY INSPECTIONS AND RIGHT TO CANCEL:** Buyer shall have ___10___ (if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.

   (b) **WALK-THROUGH INSPECTION/RE-INSPECTION:** On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

   (c) **SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS:** If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations, consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to expend, any money.

   (d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties to Buyer.

## ESCROW AGENT AND BROKER

13. **ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow within the State of Florida and, subject to COLLECTION, disburse them in accordance with terms and conditions of this Contract. Failure of funds to become COLLECTED shall not excuse Buyer's performance. When conflicting demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through mediation, arbitration, interpleader or an escrow disbursement order.

   Any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or termination of this Contract.

14. **PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition, square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or public records. BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL, WRITTEN OR OTHERWISE) OF BROKER.

Buyer's Initials _____                                     Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-3   Rev.6/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.        Page 6 of 11

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 1] www.transactiondesk.com.

Buyer and Seller (individually, the "Indemnifying Party") each individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral, recommendation or retention of any vendor for, or on behalf of Indemnifying Party; (iv) products or services provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor. Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

## DEFAULT AND DISPUTE RESOLUTION

**15. DEFAULT:**
    (a) BUYER DEFAULT: If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract, including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.

    (b) SELLER DEFAULT: If for any reason other than failure of Seller to make Seller's title marketable after reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract, Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific performance.

This Paragraph 15 shall survive Closing or termination of this Contract.

**16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled as follows:

    (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph 16(b).

    (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules"). The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16 may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph 16 shall survive Closing or termination of this Contract.

**17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")

**18. STANDARDS:**
    A. TITLE:
    (i) TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS: Within the time period provided in Paragraph 9(c), the Title Commitment with legible copies of instruments listed as exceptions attached thereto, shall be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property, subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions, prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and subsequent years; and (f)

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 1] www.transactiondesk.com.   Instanet forms

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

assumed mortgages and purchase money mortgages, if any (if additional items, attach addendum); provided, that, none prevent use of Property for RESIDENTIAL PURPOSES. If there exists at Closing any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance with law.

(ii) TITLE EXAMINATION: Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Seller fails to so notify Seller, Buyer shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period, deliver written notice to Seller: (a) extending the Cure Period for a specified period not to exceed 120 days within which Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c) electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract.

**B.** SURVEY: If Survey discloses encroachments on the Real Property or that improvements located thereon encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the preparation of such prior survey, to the extent the affirmations therein are true and correct.

**C.** INGRESS AND EGRESS: Seller represents that there is ingress and egress to the Real Property and title to the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.

**D.** LEASE INFORMATION: Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s) the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations thereunder.

**E.** LIENS: Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing statement, claims of lien or potential lienors known to Seller and (ii) that there has been no improvements or repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been paid or will be paid at Closing.

**F.** TIME: Calendar days shall be used in computing time periods. Time is of the essence in this Contract. Other than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property is located) of the next business day.

**G.** FORCE MAJEURE: Buyer or Seller shall not be required to perform any obligation under this Contract or be liable to each other for damages so long as performance or non-performance of the obligation is delayed, caused or prevented by Force Majeure. "Force Majeure" means: hurricanes, earthquakes, floods, fire, acts of God, unusual transportation delays, wars, insurrections, acts of terrorism, and any other cause not reasonably within control of Buyer or Seller, and which, by: exercise of reasonable diligent effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including Closing Date, will be extended for the period that the Force Majeure prevents performance under this Contract, provided, however, if such Force Majeure continues to prevent performance

Buyer's Initials _____   _____                    Page 7 of 11                    Seller's Initials _____   _____
FloridaRealtors/FloridaBar-ASIS-3   Rev.9/14 © 2014 Florida Realtors® and The Florida Bar.  All rights reserved.

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 1] www.transactiondesk.com.

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

under this Contract more than 14 days beyond Closing Date, then either party may terminate this Contract by delivering written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all further obligations under this Contract.

H.  CONVEYANCE: Seller shall convey marketable title to the Real Property by statutory warranty, trustee's, personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this Contract.

I.  CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:

(i)  LOCATION: Closing will take place in the county where the Real Property is located at the office of the attorney or other closing agent ("Closing Agent") designated by the party paying for the owner's policy of title insurance, or, if no title insurance, designated by Seller. Closing may be conducted by mail or electronic means.

(ii)  CLOSING DOCUMENTS: Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s), owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable the survey, flood elevation certification, and documents required by Buyer's lender.

(iii)  PROCEDURE: The deed shall be recorded upon COLLECTION of all closing funds. If the Title Commitment provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing procedure required by STANDARD J shall be waived, and Closing Agent shall, subject to COLLECTION of all closing funds, disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.

J.  ESCROW CLOSING PROCEDURE: If Title Commitment issued pursuant to Paragraph 9(c) does not provide for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and, simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.

K.  PRORATIONS; CREDITS: The following recurring items will be made current (if applicable) and prorated as of the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable, in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on current year's tax with due allowance made for maximum allowable discount, homestead and other exemptions. If Closing occurs on a date when current year's millage is not fixed but current year's assessment is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be agreed upon between the parties, falling which, request shall be made to the County Property Appraiser for an informal assessment taking into account available exemptions. A tax proration based on an estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K shall survive Closing.

L.  ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH: Seller shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections, including a walk-through (or follow-up walk-through if necessary) prior to Closing.

M.  RISK OF LOSS: If, after Effective Date, Property is damaged by fire or other casualty ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated cost to complete restoration (not to exceed 1.5% of Purchase Price), will be escrowed at Closing. If actual cost of restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.

Buyer's Initials _____ _____        Page 3 of 11        Seller's Initials _____ _____

FloridaRealtors/FloridaBar-ASIS-3  Rev.8/14 © 2014 Florida Realtors® and The Florida Bar.  All rights reserved.

This software is licensed to (Jim Balistreri - Balistreri Realty Inc II) www.transactiondesk.com.

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

**N. 1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however, cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent upon, nor extended or delayed by, such Exchange.

**O. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures, as determined by Florida's Electronic Signature Act and other applicable laws.

**P. INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended to be bound by it.

**Q. WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or rights.

**R. RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten or handwritten provisions shall control all printed provisions of this Contract in conflict with them.

**S. COLLECTION or COLLECTED:** "COLLECTION" or "COLLECTED" means any checks tendered or received, including Deposits, have become actually and finally collected and deposited in the account of Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.

**T. LOAN COMMITMENT:** "Loan Commitment" means a statement by the lender setting forth the terms and conditions upon which the lender is willing to make a particular mortgage loan to a particular borrower. Neither a pre-approval letter nor a prequalification letter shall be deemed a Loan Commitment for purposes of this Contract.

**U. APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the county where the Real Property is located.

**V. FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA, Section 1445 of the Internal Revenue Code requires the buyer of the real property to withhold 10% of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate from the IRS authorizing a reduced amount of withholding. Due to the complexity and potential risks of FIRPTA, Buyer and Seller should seek legal and tax advice regarding compliance, particularly if an "exemption" is claimed on the sale of residential property for $300,000 or less.

(i)  No withholding is required under Section 1445 if the Seller is not a "foreign person," provided Buyer accepts proof of same from Seller, which may include Buyer's receipt of certification of non-foreign status from Seller, signed under penalties of perjury, stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer shall withhold 10% of the amount realized by Seller on the transfer and timely remit said funds to the IRS.

(ii)  If Seller has received a Withholding Certificate from the IRS which provides for reduced or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the reduced sum, if any required, and timely remit said funds to the IRS.

(iii)  If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been received as of Closing, Buyer shall, at Closing, withhold 10% of the amount realized by Seller on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.

(iv)  In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for disbursement in accordance with the final determination of the IRS, as applicable.

Buyer's Initials _____   Page 9 of 11   Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-3  Rev.6/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.

This software is licensed to [Jim Ballatreri - Ballatreri Realty Inc ]] www.transactiondesk.com.

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

525  (v)  Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms 8288
526  and 8288-A, as filed.
527  **W.  RESERVED**
528  **X.  BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller and*
529  *against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
530  *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
531  *subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer. This*
532  *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
533  *Closing.*

### ADDENDA AND ADDITIONAL TERMS

535  **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into this
536  Contract (Check if applicable):

| | | |
|---|---|---|
| ☐ A.  Condominium Rider | ☐ M.  Defective Drywall | ☐ X.  Kick-out Clause |
| ☒ B.  Homeowners' Assn. | ☐ N.  Coastal Construction Control Line | ☐ Y.  Seller's Attorney Approval |
| ☐ C.  Seller Financing | ☐ O.  Insulation Disclosure | ☐ Z.  Buyer's Attorney Approval |
| ☐ D.  Mortgage Assumption | ☐ P.  Lead Based Paint Disclosure | ☐ AA.Licensee-Personal Interest in |
| ☐ E.  FHA/VA Financing | (Pre-1978 Housing) | Property |
| ☐ F.  Appraisal Contingency | ☐ Q.  Housing for Older Persons | ☐ BB.Binding Arbitration |
| ☐ G.  Short Sale | ☐ R.  Rezoning | ☒ Other SELLER'S DISCLOSURE |
| ☐ H.  Homeowners'/Flood Ins. | ☐ S.  Lease Purchase/ Lease Option | |
| ☐ I.  RESERVED | ☐ T.  Pre-Closing Occupancy by Buyer | |
| ☐ J.  Interest-Bearing Acct. | ☐ U.  Post-Closing Occupancy by Seller | |
| ☐ K.  RESERVED | ☒ V.  Sale of Buyer's Property | |
| ☐ L.  RESERVED | ☐ W.  Back-up Contract | |

557  **20. ADDITIONAL TERMS:**
538  ~~CONTRACT CONTINGENT ON SATISFACTORY HOME INSPECTION.~~
539  ~~DURING THE INSPECTION PERIOD, BUYER WILL OBTAIN WRITTEN CONFIRMATION~~
540  ~~FROM THE HOMEOWNER'S ASSOCIATION REGARDING GUESTS OCCUPYING THE~~
541  ~~PROPERTY.   IF BUYER DOES NOT TERMINATE THIS CONTRACT DURING THE~~
542  ~~INSPECTION PERIOD, THEN THIS CONDITION WILL BE DEEMED SATISFIED UPON~~
543  ~~THE EXPIRATION OF THE INSPECTION PERIOD.~~
544
545  ~~During the inspection period Seller will obtain written~~
546  ~~confirmation from the homeowner's association that paying and~~
547  ~~non-paying guests are permitted to occupy the property.~~
548  Seller will deliver a copy of the HOA documents
550  to the buyer via its broker within 5 days of
551  Effective Date.
552
553

### COUNTER-OFFER/REJECTION

555  ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and deliver
556  a copy of the acceptance to Seller).
557  ☐ Seller rejects Buyer's offer.

558  **THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE ADVICE OF**
559  **AN ATTORNEY PRIOR TO SIGNING.**

560  **THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.**

561  *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the terms and*
562  *conditions in this Contract should be accepted by the parties in a particular transaction. Terms and conditions should be*
563  *negotiated based upon the respective interests, objectives and bargaining positions of all interested persons.*

Buyer's Initials _____                    Page 10 of 11                        Seller's Initials _____
FloridaRealtors/FloridaBar-ASIS-3  Rev.9/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 3] www.transactiondesk.com.

564  AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK TO BE
565  COMPLETED.

567
568*  Buyer:                                              Date: 19 MAR 15
569          CHRISTOPHER GRECO
570
571
572
573*  Buyer:                                              Date: 19 MAR '15
574          DIANE GRECO
575
576
577
578*  Seller:                                             Date: 3/20/15
579          IRL A. SOLOMON
580
581
582
583*  Seller:                                             Date: 3/20/15
584          HELENE SOLOMON

585  Buyer's address for purposes of notice           Seller's address for purposes of notice
586*  4457 Headmont Drive                              2 Compass Isle
587*  Burlington   Ontario                             Fort Lauderdale, FL  33308
588*  Canada    L7M OT8

589
590  BROKER: Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers entitled to
591  compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct Closing Agent to
592  disburse at Closing the full amount of the brokerage fees as specified in separate brokerage agreements with the parties
593  and cooperative agreements between the Brokers, except to the extent Broker has retained such fees from the escrowed
594  funds. This Contract shall not modify any MLS or other offer of compensation made by Seller or Listing Broker to
595  Cooperating Brokers.

596
597*        CAROL A. DUDLEY                                   JIL SHAPIRO
598   Cooperating Sales Associate, if any              Listing Sales Associate
599
600*        BALISTRERI REALTY                            REALTY WORLD SOUTH FLORIDA
601   Cooperating Broker, if any                       Listing Broker

FloridaRealtors/FloridaBar-ASIS-3   Rev.9/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 1] www.transactiondesk.com.



## Comprehensive Rider to the
## Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR

 **FloridaRealtors**

When initialed by all parties, the parties acknowledge that the disclosure set forth below was provided to Buyer prior to execution of the Florida Realtors/Florida Bar Residential Contract For Sale and Purchase between

IRL A SOLOMON AND HELENE SOLOMON _____ (SELLER)

and CHRISTOPHER GREGG AND DIANE GREGG _____ (BUYER)

concerning the Property described as    2    COMPASS ISLE, FORT LAUDERDALE, FL  33308

**Buyer's Initials** _____   _____        **Seller's Initials** _____   _____

### B. HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE

IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.

BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THIS DISCLOSURE.

Disclosure Summary For _____ BAY COLONY _____
                                        (Name of Community)

(a) AS A BUYER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNERS' ASSOCIATION ("ASSOCIATION").
(b) THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS ("COVENANTS") GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.
(c) YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. ASSESSMENTS MAY BE SUBJECT TO PERIODIC CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $___1500.00___ PER ___QUARTER___. YOU WILL ALSO BE OBLIGATED TO PAY ANY SPECIAL ASSESSMENTS IMPOSED BY THE ASSOCIATION. SUCH SPECIAL ASSESSMENTS ARE SUBJECT TO CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $_____ PER _____.
(d) YOU MAY BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY, OR SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.
(e) YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNERS' ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.
(f) THERE MAY BE AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION. IF APPLICABLE, THE CURRENT AMOUNT IS $_____ PER _____.
(g) THE DEVELOPER MAY HAVE THE RIGHT TO AMEND THE RESTRICTIVE COVENANTS WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERSHIP OR THE APPROVAL OF THE PARCEL OWNERS.
(h) THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE, AND, AS A PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING DOCUMENTS BEFORE PURCHASING PROPERTY.
(i) THESE DOCUMENTS ARE EITHER MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED, OR ARE NOT RECORDED AND CAN BE OBTAINED FROM THE DEVELOPER.

19 mAR 15 _____
DATE

19 MAR 15 _____
DATE

BUYER CHRISTOPHER GREGG

BUYER DIANE GREGG

Page 1 of 1   B. HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE
CR-3 Rev. 9/14 © 2014 Florida Realtors® and The Florida Bar. All rights reserved.

This software is licensed to [Jim Balistreri - Balistreri Realty Inc 1] www.transactiondesk.com.  

# EXHIBIT B

# Contents

Mar.21 Email with Bay Colony Docs..................................................................................................................2

Mar.21 Arch.Committee Docs........................................................................................................................3

Mar.21 Bay Colony Docs 1 (second receipt)..................................................................................................4

Mar.21 Bay Colony Docs #2 (second receipt)................................................................................................5

Mar.21 Greggs noting HOA wording ..............................................................................................................6

Mar.24 Greggs noting wording of received docs and requesting any additional ..............................................7

Mar.24 Carol's reply to the above..................................................................................................................8

## Mar.21 Email with Bay Colony Docs



From: Carol Anne Dudley <caroldud@hotmail.com>
To: dianejgregg@gmail.com
Cc:
Subject: FW: Proof of Funds letter
Sent: Sat 3/21/2015 12:02 PM

Message | Bay Colony Docs Part 1.pdf (11 MB)   Bay Colony Docs Part 2.pdf (12 MB)

Carol Dudley
Balistreri Realty International
Cell 407-791-7462 Business 954-545-1600
carolannedudley@gmail.com
www.PremierPropertiesinFlorida.com
www.VacationVillasFlorida.co.uk

Date: Sat, 21 Mar 2015 14:31:15 +0000
From: jilshapiro@bellsouth.net
To: caroldud@hotmail.com
CC: jilshapiro@bellsouth.net
Subject: Re: Proof of Funds letter

Carol,
Please find attached Bay Colony Bylaws as per contract request.
I will be sending them in 2 emails as they are large

Take care.
Carol

## Mar.21 Arch.Committee Docs



Please find more documents.

Carol Dudley
Balistreri Realty International
Cell 407-791-7462 Business 954-545-1600
carolannedudley@gmail.com
www.PremierPropertiesinFlorida.com
www.VacationVillasFlorida.co.uk

---

Date: Sat, 21 Mar 2015 14:34:33 +0000
From: jilshapiro@bellsouth.net
To: caroldud@hotmail.com
CC: jilshapiro@bellsouth.net
Subject: HOA DOCS

Attached HOA Docs.

*Jil Shapiro*
Realtor®
Realty World South Florida
954-336-1468

3

## Mar.21 Bay Colony Docs 1 (second receipt)



From: Carol Anne Dudley <caroldud@hotmail.com>          Sent: Sat 3/21/2015 12:09 PM
To: dianejgregg@gmail.com
Cc:
Subject: FW: Proof of Funds letter
Message | Bay Colony Docs Part 1.pdf (11 MB)

Forwarding more documents for you. I think there is one more to come.

Carol Dudley
Balistreri Realty International
Cell 407-791-7462 Business 954-545-1600
carolannedudley@gmail.com
www.PremierPropertiesinFlorida.com
www.VacationVillasFlorida.co.uk

Date: Sat, 21 Mar 2015 14:39:04 +0000
From: jilshapiro@bellsouth.net
To: caroldud@hotmail.com
CC: jilshapiro@bellsouth.net
Subject: Re: Proof of Funds letter

Carol,
Please find attached Bay Colony Bylaws as per contract request.
I will be sending them in 3 emails as the files are too big.
Thank you,

Jil Shapiro
Realtor®
Realty World South Florida
954-336-1468

4

## Mar.21 Bay Colony Docs #2 (second receipt)



| From: | Carol Anne Dudley <caroldud@hotmail.com> | Sent: Sat 3/21/2015 12:14 PM |
|---|---|---|
| To: | dianejgregg@gmail.com | |
| Cc: | | |
| Subject: | FW: HOA DOCS | |

Message | Bay Colony Docs Part 2.pdf (12 MB)

Hi Diane,

This is the last one. I am traveling all day tomorrow so have a lovely Sunday and speak on Monday.

Carol

## Mar.21 Greggs noting HOA wording

| From: | Christopher Gregg <ChrisG@Travelpath.com> | | | Sent: | Sat 3/21/2015 12:16 PM |
|---|---|---|---|---|---|
| To: | Carol Anne Dudley; Diane Gregg; rick@balistreri.com | | | | |
| Cc: | Diane Gregg | | | | |
| Subject: | RE: Signatures attached | | | | |

Message    Wire_01 21Mar15.pdf (441 KB)

Hello Carol. Attached is bank confirmation that funds were sent by wire today.

You do not have our authority to schedule a house inspection until our lawyer has reviewed the Homeowners Agreement and we have found it acceptable.  It is the wording of the HOA regarding our ability to have paying and non paying guests as outlined to you and Rick many times that will determine if we proceed with this purchase.

Please confirm the cost of the inspection and how we should be making payment for the service. Our contractor will also be present during the inspection once scheduled.

I thus suggest that the HOA documents be provided at the earliest possible time.

Kind regards,
Christopher

Travelpath Inc.

---

**From:** Carol Anne Dudley [caroldud@hotmail.com]
**Sent:** March-21-15 6:29 AM
**To:** Diane Gregg; rick@balistreri.com; Christopher Gregg
**Subject:** RE: Signatures attached

Good morning to you Diane and Chris.

That all sounds wonderful to me and I thank you for your prompt response.
I am trying to get the home inspection done on Tuesday and will let you know everything on Monday when I will be back in the office.

Have a super weekend.

Best regards

Carol Dudley

## Mar.24 Greggs noting wording of received docs and requesting any additional



From: Diane Gregg <DianeG@Travelpath.com>                    Sent: Tue 3/24/2015 8:42 AM
To:      dianejgregg@gmail.com
Cc:
Subject:  FW: HOA Review

**From:** Christopher Gregg
**Sent:** March-24-15 8:37 AM
**To:** caroldud@hotmail.com; rick@balistreri.com
**Cc:** Diane Gregg
**Subject:** HOA Review

Good morning everyone,
After a review of the HOA documents provided by Carol on Mar.21, we have been advised that there is no clause prohibiting paying and non-paying guests from occupying the premises at 2 Compass Isle under the ownership of the Greggs or an assigned company.

Diane has requested confirmation that **all** of the HOA documents have been sent to us. As of now we have not been provided this confirmation from either the vendors' realtor or Carol.

The Greggs are performing the inspections today for roof, house, termites and seawall at our expense as required based on the following facts:
1. The first inspection from our contractor's inspector was not until March 30, the final day of the Inspection Period and thus being too tight for comfort.
2. Carol stating that she could organize her inspectors for today (her only available time until Mar.31) which she has kindly done.

The Greggs are acting in good faith that we are in position of all HOA documents, which having been reviewed show no impact on paying and non-paying guests from accessing and occupying the premises at 2 Compass Isle.

The above does not negate our ongoing request for confirmation that we are in receipt of all HOA documents to include any that are specific to new purchasers or any documents that require signature between the homeowner and the HOA.

### Christopher Gregg
*President*

Travelpath
4190 South Service Road, Suite 101
Burlington, ON., L7L 4X5
Tel **905-319-8818 ext. 100** Fax 905-319-0081
Across North America 1-800-363-6211
Website: www.travelpath.com
Hiking Holidays (www.hikingholidays.ca) and Diving Holidays (www.divingholidays.ca) are divisions of Travelpath Inc.

7

## Mar.24 Carol's reply to the above



From: Diane Gregg <DianeG@Travelpath.com>                                   Sent: Tue 3/24/2015 9:00 AM
To: dianejgregg@gmail.com
Cc:
Subject: FW: HOA Review

Hi Chris and Diane,

I have been working for you this morning and had a long chat with the sellers realtor.

Everything Jill sent me and I forward to you were the FULL HOA docs.

I have asked the sellers realtor, Jill, to double check and send everything again so we do not miss anything at all.

I will be receiving the sellers property disclosure this morning and I will get it to you asap.

Carol Dudley
Balistreri Realty International
Cell 407-791-7462 Business 954-545-1600
carolannedudley@gmail.com
www.PremierPropertiesinFlorida.com
www.VacationVillasFlorida.co.uk

From: ChrisG@Travelpath.com
To: caroldud@hotmail.com; rick@balistreri.com
CC: DianeG@Travelpath.com
Subject: HOA Review
Date: Tue, 24 Mar 2015 12:37:14 +0000

Good morning everyone,
After a review of the HOA documents provided by Carol on Mar.21, we have been advised that there is no clause prohibiting paying and
non-paying guests from occupying the premises at 2 Compass Isle under the ownership of the Greggs or an assigned company.

8

# EXHIBIT C



**BAY COLONY**

**PROTECTIVE ASSOCIATION INC.**

Guard House; One Compass Drive; Fort Lauderdale, FL 33308-2010

JANUARY 1, 1978 (as amended in 1980, 1981, 1998, and 2015)

<u>THE RULES OF BAY COLONY</u>

1.  No visitors will be permitted unless, upon telephone inquiry from the Gate House, specific permission is received allowing the visitor to enter and to proceed DIRECTLY to a resident's home. Residents may call the Gate House in advance to expedite admission, if the guest is expected.

    If there is no answer, or if the guard is given negative instructions, the visitor will be politely turned away.

    When a <u>resident</u> plans a party, it is essential that the guards be given a list of guests in advance. It is a violation of our security efforts to instruct the guards: "Just let in anyone who says they are coming to my party". The Association will not be responsible if any guest is turned away, when there is no acceptable pre-arrangement for identification. Parental Approval is required for teenage parties/gatherings with five or more teenagers. If the guard does not receive permission from the homeowner/renter the teenager will not be allowed access to Bay Colony.

2.  Commercial vehicles providing delivery services from established companies, and utility service vehicles, will be permitted access without a call, after identification.

    Gardening service vehicles and pool maintenance trucks are generally permitted access if the companies are known to the guards. If it is a "first time" visit, identification and authorization will be required. <u>None are permitted on weekends or holidays.</u>

    Commercial vehicles are allowed in Bay Colony between 8 A.M. and 6 P.M. Monday through Friday and between 9 A.M. and 5 P.M. on Saturdays. No construction, maintenance or repair work is permitted on Sundays and National holidays. Residents shall be called after 6 P.M. and reminded of the prescribed departure times.

    Emergency Exceptions: Telephone Co., Electric Co., air conditioning companies, locksmiths, catering companies for parties, plumbing companies, florist deliveries, drug store and medical deliveries, plus any other emergency situation. However, if resident has not advised Gate House in advance, guard must call resident before allowing any of above to enter. This applies to after 6 P.M. on weekdays and Saturday, Sunday and holidays.

    Residents <u>shall not</u> permit visitors to use the resident's name to enter Bay Colony for the purpose of touring through the area.

    The granting of entrance permission by children in the resident's household has become a problem. They have sometimes given permission contrary to parents' wishes. It is necessary, therefore, that except in emergencies, entrance permission must be granted by responsible adults in the residence. Guards will use discretion with children.

### THE RULES OF BAY COLONY

Guards have been instructed that they should not assume that a recurrent visitor is always welcome and the telephone call should be made in every event. Please do not give the guards contrary instructions. We would rather exercise caution in furtherance of privacy. On rare occasions, there is a traffic back-up while visitors identify themselves or the resident's phone is not answered promptly when the guard calls. While this is regrettable, the Board has opted in favor of privacy.

Gate openers may not be given to non-residents. Openers found in possession of non-residents will be picked up by the guards.

Guests arriving at the gate between 11:00 P.M. and 6:00 A.M. will not be admitted, except in a genuine emergency or when the resident has given permission in advance. No calls will be made to residents by the guards between 11:00 P.M. and 6:00 A.M.

3.  Garbage cans should be visible only on garbage collection days; however, containers may be placed at curbside after dusk the day prior to pick-up, or garbage cans may be placed curbside at dusk, the day before, however, must be brought back in, out of sight by 9pm the day of pickup. Current garbage pickup days are Mondays and Thursdays. This also applies to recycling on Mondays.

4.  Boats on trailers or other storage may not be left in driveways, lawns, or streets. Commercial or heavy trucks, motorcycles, motor homes, et cetera, should not be parked on or near the outside of the property for extended periods of time. Vans should be parked inside the garage.

5.  Garage doors should be kept closed as much as possible. For your security, guards will attempt to notify you if your garage door is open at night. Residents will be called only after dark.

6.  With regard to "For Sale" homes upon which there is broker representation, that broker must be present on the property when a showing is made. The showing shall in any case, be by appointment; no "Open Houses". Brokers should have letters of introduction from the residents to show to the guards. No signs are allowed on Bay Colony homes or lawns; please see Declaration of 1967. Any Realtors that come into Bay Colony to show a specific property are to go directly to the property, proceed with the showing, then leave directly from the property. Realtors and/or clients are not permitted to "tour" Bay Colony properties. Any offenders will not be permitted future access to Bay Colony.

7.  From time to time, there are requests from the news media for interviews with Bay Colony residents. These interviews frequently deal with the matter of our private streets and why we do not allow non-residents to drive through Bay Colony. The Directors have requested no interviews regarding Bay Colony be undertaken by residents. If the problem seems urgent, it should be referred to the President of the Association who will discuss it with the Association's attorney.

8.  Each resident shall maintain street lights or landscape lights which illuminate the street side of their house all night every night. For residents who do not have timers to control such lighting, Management can provide a list of approved venders to assist. The Board has set fines for those who do not comply. Fines will be levied against residents who do not maintain lighting on a regular basis. The Board has set the fine at $250 each month that lighting is not maintained.

9.  Private parties - guard service: The Board of Directors has previously noted that in addition to providing a list of guests, resident must employ guards to direct traffic to appropriate parking, on a basis of one guard for 15-25 cars, two guards for 25-35 cars, and one guard for every 15 cars over 35. The number of cars allowed to enter for a party will be restricted to the number quoted to the guards. After that number is reached, subsequent arrivals will NOT be allowed to enter Bay Colony. As to parties for teenagers, the resident will hire one guard for each school bus and one guard for each 15-25 teenagers.

10. Traffic Violation Rules of March 1998
    In March, 1998 the Board voted the following: Speed limit in Bay Colony is 20 mph, at blind curves, 10 mph.

## THE RULES OF BAY COLONY

Traffic offenses:
First offense:          Warning - no charge.
Second offense:         Fine of $25.00.
Third offense:          Fine  of $100.00 and barred from driving in Bay Colony for 30 days.
Fifth offense:          Fine  of $100.00 and barred from driving in Bay Colony for 60 days.
Sixth offense:          Fine  of $100.00 and barred from driving in Bay Colony for 90 days.
Subsequent offenses:    Fine  of $100.00 and barred from driving in Bay Colony for One Year.

Speeding over 35 MPH, an additional $100.00 will be added to the fine.

Outsiders including trades people shall be ticketed for traffic offenses, for which a form is filled out and a copy sent to the homeowner who shall be responsible for the fine payment.

Residents shall be required to pay all fines within 30 days.
Visitors shall be required to pay all fines before reentry but within 30 days.

All traffic violations will be based on a one year (12) month basis from when the first offense occurred.

Intoxication - driver's vehicle will be stopped. A resident will be returned home by guard.

11.   Rentals - All renters must appear before the Board of Directors for Board approval.  Three references must be presented to the Board at least two weeks before said meeting.  A minimum of three board members must be present at this meeting.  To set up a time to meet with the Board, the prospective renter or the person who is renting the property, shall contact the management company for a specific meeting time.

12.   Noise Restrictions:  The City of Fort Lauderdale regulates maximum permissible sound levels and the associated hours.  The current requirements essentially limit excessive noise between the hours of 10:00 p.m. and 7:00 a.m.  Consistent with Bay Colony's restriction on commercial activity, residents shall limit excessive noise until 8:00 a.m. For excessive noise after 10:00 p.m., the guards are instructed to provide consideration for occasional events until 11:00 p.m. on weeknights and midnight on Friday and Saturday nights.

13.   Solicitation - There shall be no solicitations by any person for any cause, charity or any purpose whatsoever, unless specifically authorized by the Board of Directors.

14.   Contractors, Association Employees and Vendors: No owner or member of his family or guest shall give orders or instruction to the Association Agents, Employees or vendors, but rather shall express his desires in writing to the person designated for this purpose by the Board of Directors.

The passage of these rules is incumbent upon residents under law because of the privacy of the streets, and these rules are in the best interests of protecting the rights of all of the owners of Bay Colony.  Should there ever be any "over-enthusiasm" on the part of the guards in enforcing these rules, all owners should feel free to call the President or any member of the Board immediately.

9/15/2015 9:35 AM

# EXHIBIT D

## Assignment of Contract for Purchase of Real Estate

For value received, we, Christopher Gregg and Diane Gregg, husband and wife, as assignor, hereby transfer and assign to Travelpath Canada Limited, as assignee, its heirs and assigns, all rights and interest in that contract between Irl A. Solomon and Helene Solomon, husband and wife, seller, and assignor Christopher Gregg and Diane Gregg, husband and wife, as purchaser dated the 19th day of March, 2015 for the sale of the premises known as 2 Compass Isle, Fort Lauderdale, FL 33308, more particularly described in said contract, subject to the covenants, conditions, and payments contained in said contract. We authorize and empower assignee, on its performance of all the above mentioned covenants, conditions, and payments to demand and receive of seller the deed covenanted to be given in the contract hereby assigned in the same manner and with the same affect as we could have done had this assignment not been made.

DATED: __15 JUN '15__

_____
Christopher Gregg (Purchaser/Assignor)

_____
Diane Gregg (Purchaser/Assignor)

Acceptance by Assignee

Travelpath Canada Limited, accepts the above assignment of that contract made the 19th day of March, 2015. It agrees to perform all obligations to the performed by assignor under the contract, and to indemnify assignor against any liability arising the performance or nonperformance of such obligations.

DATED: __15 JUN '15__

Travelpath Canada Limited,

_____
Christopher B. Gregg, President
I have authority to bind the Corporation

Consent by Seller

We, Irl A. Solomon and Helen Solomon, husband and wife, the Seller named in the contract herein assigned consent to this assignment to Travelpath Canada Limited, assignee.

DATED:_____

_____
Irl A. Solomon, Seller

_____
Helene Solomon, Seller

**EXHIBIT E**

**MLF** | **Michael L. Feinstein, P.A.**
ATTORNEYS AND COUNSELORS AT LAW

July 31, 2017

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Ira A. Solomon
4300 N.E. 21ˢᵗ Avenue
Fort Lauderdale, FL 33308

7011 2970 0001 9954 1345

> *Re: Mr. and Mrs. Christopher Gregg and Travelpath Canada Limited v.
> Ira and Helen Solomon et al.*

Dear Mr. Solomon:

I represent Christopher and Diane Gregg (the "Greggs") and Travelpath Canada Limited. in connection with the sale and purchase of the property at 2 Compass Isle, Fort Lauderdale, FL 33308. After my review of the Contract for Sale and Purchase (the "Contract") and other pertinent documents relevant to the transaction, and based upon my legal research and analysis in connection therewith, I have advised my clients that they have a viable claim under Florida law against you for Breach of Contract.

The Contract between you and the Greggs for Sale and Purchase of the 2 Compass Isle property in Bay Colony was signed on March 19, 2015. Among other provisions, there was a handwritten provision inserted under paragraph number 20 of the Contract, which was hand-initialed by both sellers. The provision states: **"Seller will deliver a copy of the HOA documents to the buyer via its broker within 5 days of Effective Date."** Accordingly, I have advised the Greggs that you had a contractual obligation to provide them with all HOA documents by no later than March 25ᵗʰ 2015.

Subsequent to the parties signing the Contract, the Greggs assigned their rights under the Contract to Travelpath Canada Limited on June 15, 2015 (the "Assignment"), and as a result, Travelpath Canada Limited went on to take title and become the legal owner of the property. Travelpath, Inc. of which the Greggs

are the owners, is located in Burlington, Ontario, Canada, and offers high quality services for business and vacation travelers and corporations based in Canada.

On March 21, 2015, your agent in connection with the sale of the property, Jill Shapiro of Realty World South Florida, transmitted several emails to Carol Dudley of Balistreri Realty, the realtor representing the Greggs in their purchase of the property. These emails, along with some related emails, are summarized below:

**March 21, 2015 at 14:31:15** - email from Jill Shapiro to Carol Dudley [Jill wrote: "Please find attached the Bay Colony Bylaws per contract request. I will be sending them in 2 emails as they are large."]

**March 21, 2015 at 12:02 PM** – email from Carol Dudley to Diane Gregg forwarding the preceding (14:31:15) email and attachment from Jill Shapiro to Carol Dudley [Carol did not write any message to Diane, but just forwarded Jill's email]

**March 21, 2015 at 14:34:33** – email from Jill Shapiro to Carol Dudley [Jill wrote: "Attached HOA Docs."]

**March 21, 2015 at 12:04 PM** - email from Carol Dudley to Diane Gregg, forwarding the preceding (14:34:33) email and attachment from Jill Shapiro to Carol [Carol wrote: "Please find more documents."]

**March 21, 2015 at 14:39:04** – email from Jill Shapiro to Carol Dudley [Jill wrote: "Please find attached Bay Colony Bylaws as per contract request. I will be sending them in 3 emails as the files are too big…"]

**March 21, 2015 at 12:09 PM** – email from Carol Dudley to Diane Gregg, forwarding the preceding (14:39:04) email and attachment from Jill to Carol [Carol wrote to Diane: "Forwarding more documents for you. I think there is one more to come."]

**March 24, 2015 at 8:37 AM** – email from Christopher Gregg to Carol Dudley and Rick Balistreri (of Balistreri), and Diane Gregg [Christopher wrote: "After a review of the HOA documents provided by Carol on Mar. 21 we have been advised there is no clause prohibiting paying and non-paying guests from occupying the premises at 2 Compass Isle under the ownership of the Greggs or an

assigned company. Diane has requested confirmation that **all** of the HOA documents have been sent to us. As of now we have not been provided the confirmation from either the vendor's realtor or Carol...The Greggs are acting in good faith that we are in possession of all HOA documents, which having been reviewed show no impact on paying and non-paying guests from accessing and occupying the premises at 2 Compass Isle. The above does not negate our ongoing request for confirmation that we are in receipt of all HOA documents..." (Emphasis in original)]

**March 24, 2015 at 9:00 AM (or shortly before)** – email from Carol Dudley to Christopher and Diane Gregg [Carol wrote: "I have been working for you this morning and had a long chat with the seller's realtor. Everything Jill sent me and I forwarded to you were the **FULL HOA** docs. I have asked the seller's realtor to double check and to send everything again so we do not miss anything at all..." (Emphasis in original)]

As it turned out, the "FULL HOA" documents were not provided to the Greggs as required under the Contract, resulting in profound financial repercussions to my clients. The most important document of all, the Bay Colony HOA Rules were not provided. All parties involved in the transaction knew or should have known how vital it was to the Greggs to determine whether there were any prohibitions and/or restrictions that would have an impact upon their ability to rent the property.

Yet, it was not until August of 2015 that the Greggs learned of an HOA Rule that would effectively preclude them from renting the property to short-term renters and/or to use the property, at least part of the time, as a VRBO.

The HOA Rule in question is Rule Number 11, which provides:

"**Rentals** - All renters must appear before the Board of Directors for Board approval. Three references must be presented to the Board at least two weeks before said meeting. A minimum of three board members must be present at this meeting. To set up a time to meet with the Board, the prospective renter or the person who is renting the property shall contact the management company for a specific meeting time." (Copy attached hereto).

It is self-evident that this Rule effectively precludes Travelpath Canada Limited/the Greggs from procuring any short-term and/or VRBO renters, particularly business associates and/or friends of the Greggs and Travelpath, Inc. from Canada, where the Greggs reside. Such individuals are obviously not going to travel down from Canada to go through the above-mentioned, onerous pre-screening process, and at their substantial expense, in connection with any desire or willingness they might otherwise have had to rent the property on a short-term basis, in the mere hope that they will be approved by the Board at some undetermined point in time, then travel back to Canada to await the Board's (positive or negative) decision, which even if positive, would be exceedingly unlikely to coincide with the desired date(s) of the rental, either from the point of view of the Greggs or the prospective renter(s).

Clearly, there would be no way for the Greggs to schedule which prospective renters would be able to occupy the property when, and/or whether such occupancy would overlap with a time(s) that other prospective renters might be desirous of renting the property, or with a time that the Greggs, themselves, might choose to occupy the home. Simply put, attempting to comply with the Rule would be a logistical nightmare for all concerned, but in any event, the Rule makes it virtually impossible to ever use the property for short-term rental purposes, thus frustrating one of the primary purposes for which the property was purchased, and significantly diminishing the utilization and the value of the property, and the benefit of the bargain under the Contract. The avowed mission of Travelpath as stated on its website is to "offer an uncomplicated, yet sophisticated approach to business travel management that not only ensures a high level of service for all of your company's travel needs but also manages your travel in a way that saves you time, trouble and money."[1] Clearly, Travelpath, Inc. and the Greggs will be unable to come anything close to fulfillment of that goal as regards the subject property at 2 Compass Isle.

Worse yet, my clients are now out-of-pocket $529,431.90 for construction, $96,460 for furnishings, $268,617.45 for operational expenses including additional repairs through April 30, 2017, $14,271.63 for ongoing monthly operating expenses which continue to accrue and legal fees that have begun to accrue after April 30, 2017. That being said, my clients are now out-of-pocket $923,052.60 which were expended in reliance and under the expectation that they would eventually be able to recoup such sums through the intended rentals. These expenditures would definitely not have been made, indeed the purchase of property

---

[1] See http://www.travelpath.com/about-travelpath/

would not even have been consummated, but for my clients' belief that they had been provided with the full HOA documents, and that there were no restrictions on rentals, especially the kind that did, unbeknownst to them, exist. Despite, my clients' good faith in going forward with the purchase, and their best efforts to ascertain whether they would be precluded from fulfilling their intention to use the property for short-term rentals, they were essentially blindsided by the material failure of the sellers to keep up their end of the bargain and to provide all HOA documents, including the single most important document, which the sellers were expressly obligated to provide under the Contract.

My clients are very reasonable and fair-minded, and they are hopeful that an amicable settlement of their Breach of Contract claim can be achieved without the necessity of court action. In this regard, paragraph 16(b) of the Contract provides for out-of-court Mediation, conducted by a Certified Mediator, of any disputes that arise between the Sellers and Purchasers in connection with the Contract. The costs of the Mediation are to be split by the parties, and each party bears the cost of his/her/its own attorney's fees incurred in connection with the Mediation. Therefore, please consider this letter as formal notification of my clients' claim of breach of contract and a demand for Mediation of such claim. I believe that it would certainly be efficacious for all concerned to work out a satisfactory settlement of this matter in Mediation. However, in the event that should not occur, the mediation is not "binding" on the parties, and accordingly, a civil action for Breach of Contract (and for recovery of attorney's fees and costs pursuant to paragraph 17 of the Contract) will be filed in the Broward County Circuit Court or the Federal District Court for the Southern District of Florida. In this regard, paragraph 16(b) of the Contract provides that, "Disputes not settled pursuant to this Paragraph 16 may be resolved by instituting action in the appropriate court having jurisdiction of the matter."

If you are represented by legal counsel, or in the event you retain such counsel, please transmit this letter to them, and have them contact me directly as soon as possible. My clients expect a response within no more than two (2) weeks of the date of this letter so that we can begin to make arrangements for the Mediation. Since I have advised my clients that other parties are likely to be liable to them for negligence in connection with the failure to timely provide the full

HOA documents to them, including the realtors for both sellers and purchaser it would be most desirable to have all affected parties participate in the Mediation, assuming that it is agreed among all to do so.

## PLEASE GOVERN YOURSELVES ACCORDINGLY!

Sincerely,

Michael I. Feinstein, Esq.
Fort the firm

cc:    Mr. & Mrs. Gregg

**MLF**  **Michael L. Feinstein, P.A.**
ATTORNEYS AND COUNSELORS AT LAW

July 31, 2017

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Helene Solomon                    7011 2970 0001 9954 1352
2624 N.E. 26th Street
Fort Lauderdale, FL 33305

> *Re: Mr. and Mrs. Christopher Gregg and Travelpath Canada Limited v.*
> *Ira and Helen Solomon et al.*

Dear Ms. Solomon:

I represent Christopher and Diane Gregg (the "Greggs") and Travelpath Canada Limited. in connection with the sale and purchase of the property at 2 Compass Isle, Fort Lauderdale, FL 33308. After my review of the Contract for Sale and Purchase (the "Contract") and other pertinent documents relevant to the transaction, and based upon my legal research and analysis in connection therewith, I have advised my clients that they have a viable claim under Florida law against you for Breach of Contract.

The Contract between you and the Greggs for Sale and Purchase of the 2 Compass Isle property in Bay Colony was signed on March 19, 2015. Among other provisions, there was a handwritten provision inserted under paragraph number 20 of the Contract, which was hand-initialed by both sellers. The provision states: "**Seller will deliver a copy of the HOA documents to the buyer via its broker within 5 days of Effective Date.**" Accordingly, I have advised the Greggs that you had a contractual obligation to provide them with all HOA documents by no later than March 25th 2015.

Subsequent to the parties signing the Contract, the Greggs assigned their rights under the Contract to Travelpath Canada Limited on June 15, 2015 (the "Assignment"), and as a result, Travelpath Canada Limited went on to take title and become the legal owner of the property. Travelpath, Inc. of which the Greggs

are the owners, is located in Burlington, Ontario, Canada, and offers high quality services for business and vacation travelers and corporations based in Canada.

On March 21, 2015, your agent in connection with the sale of the property, Jill Shapiro of Realty World South Florida, transmitted several emails to Carol Dudley of Balistreri Realty, the realtor representing the Greggs in their purchase of the property. These emails, along with some related emails, are summarized below:

**March 21, 2015 at 14:31:15** - email from Jill Shapiro to Carol Dudley [Jill wrote: "Please find attached the Bay Colony Bylaws per contract request.  I will be sending them in 2 emails as they are large."]

**March 21, 2015 at 12:02 PM** – email from Carol Dudley to Diane Gregg forwarding the preceding (14:31:15) email and attachment from Jill Shapiro to Carol Dudley [Carol did not write any message to Diane, but just forwarded Jill's email]

**March 21, 2015 at 14:34:33** – email from Jill Shapiro to Carol Dudley [Jill wrote: "Attached HOA Docs."]

**March 21, 2015 at 12:04 PM** - email from Carol Dudley to Diane Gregg, forwarding the preceding (14:34:33) email and attachment from Jill Shapiro to Carol [Carol wrote: "Please find more documents."]

**March 21, 2015 at 14:39:04** – email from Jill Shapiro to Carol Dudley [Jill wrote: "Please find attached Bay Colony Bylaws as per contract request.  I will be sending them in 3 emails as the files are too big..."]

**March 21, 2015 at 12:09 PM** – email from Carol Dudley to Diane Gregg, forwarding the preceding (14:39:04) email and attachment from Jill to Carol [Carol wrote to Diane: "Forwarding more documents for you.  I think there is one more to come."]

**March 24, 2015 at 8:37 AM** – email from Christopher Gregg to Carol Dudley and Rick Balistreri (of Balistreri), and Diane Gregg [Christopher wrote: "After a review of the HOA documents provided by Carol on Mar. 21 we have been advised there is no clause prohibiting paying and non-paying guests from occupying the premises at 2 Compass Isle under the ownership of the Greggs or an

assigned company. Diane has requested confirmation that **all** of the HOA documents have been sent to us. As of now we have not been provided the confirmation from either the vendor's realtor or Carol...The Greggs are acting in good faith that we are in possession of all HOA documents, which having been reviewed show no impact on paying and non-paying guests from accessing and occupying the premises at 2 Compass Isle. The above does not negate our ongoing request for confirmation that we are in receipt of all HOA documents..." (Emphasis in original)]

**March 24, 2015 at 9:00 AM (or shortly before)** – email from Carol Dudley to Christopher and Diane Gregg [Carol wrote: "I have been working for you this morning and had a long chat with the seller's realtor. Everything Jill sent me and I forwarded to you were the **FULL HOA** docs. I have asked the seller's realtor to double check and to send everything again so we do not miss anything at all..." (Emphasis in original)]

As it turned out, the "FULL HOA" documents were not provided to the Greggs as required under the Contract, resulting in profound financial repercussions to my clients. The most important document of all, the Bay Colony HOA Rules were not provided. All parties involved in the transaction knew or should have known how vital it was to the Greggs to determine whether there were any prohibitions and/or restrictions that would have an impact upon their ability to rent the property.

Yet, it was not until August of 2015 that the Greggs learned of an HOA Rule that would effectively preclude them from renting the property to short-term renters and/or to use the property, at least part of the time, as a VRBO.

The HOA Rule in question is Rule Number 11, which provides:

"**Rentals** - All renters must appear before the Board of Directors for Board approval. Three references must be presented to the Board at least two weeks before said meeting. A minimum of three board members must be present at this meeting. To set up a time to meet with the Board, the prospective renter or the person who is renting the property shall contact the management company for a specific meeting time." (Copy attached hereto).

It is self-evident that this Rule effectively precludes Travelpath Canada Limited/the Greggs from procuring any short-term and/or VRBO renters, particularly business associates and/or friends of the Greggs and Travelpath, Inc. from Canada, where the Greggs reside. Such individuals are obviously not going to travel down from Canada to go through the above-mentioned, onerous pre-screening process, and at their substantial expense, in connection with any desire or willingness they might otherwise have had to rent the property on a short-term basis, in the mere hope that they will be approved by the Board at some undetermined point in time, then travel back to Canada to await the Board's (positive or negative) decision, which even if positive, would be exceedingly unlikely to coincide with the desired date(s) of the rental, either from the point of view of the Greggs or the prospective renter(s).

Clearly, there would be no way for the Greggs to schedule which prospective renters would be able to occupy the property when, and/or whether such occupancy would overlap with a time(s) that other prospective renters might be desirous of renting the property, or with a time that the Greggs, themselves, might choose to occupy the home. Simply put, attempting to comply with the Rule would be a logistical nightmare for all concerned, but in any event, the Rule makes it virtually impossible to ever use the property for short-term rental purposes, thus frustrating one of the primary purposes for which the property was purchased, and significantly diminishing the utilization and the value of the property, and the benefit of the bargain under the Contract. The avowed mission of Travelpath as stated on its website is to "offer an uncomplicated, yet sophisticated approach to business travel management that not only ensures a high level of service for all of your company's travel needs but also manages your travel in a way that saves you time, trouble and money."[1] Clearly, Travelpath, Inc. and the Greggs will be unable to come anything close to fulfillment of that goal as regards the subject property at 2 Compass Isle.

Worse yet, my clients are now out-of-pocket $529,431.90 for construction, $96,460 for furnishings, $268,617.45 for operational expenses including additional repairs through April 30, 2017, $14,271.63 for ongoing monthly operating expenses which continue to accrue and legal fees that have begun to accrue after April 30, 2017. That being said, my clients are now out-of-pocket $923,052.60 which were expended in reliance and under the expectation that they would eventually be able to recoup such sums through the intended rentals. These expenditures would definitely not have been made, indeed the purchase of property

---

[1] See http://www.travelpath.com/about-travelpath/

would not even have been consummated, but for my clients' belief that they had been provided with the full HOA documents, and that there were no restrictions on rentals, especially the kind that did, unbeknownst to them, exist. Despite my clients' good faith in going forward with the purchase, and their best efforts to ascertain whether they would be precluded from fulfilling their intention to use the property for short-term rentals, they were essentially blindsided by the material failure of the sellers to keep up their end of the bargain and to provide all HOA documents, including the single most important document, which the sellers were expressly obligated to provide under the Contract.

My clients are very reasonable and fair-minded, and they are hopeful that an amicable settlement of their Breach of Contract claim can be achieved without the necessity of court action. In this regard, paragraph 16(b) of the Contract provides for out-of-court Mediation, conducted by a Certified Mediator, of any disputes that arise between the Sellers and Purchasers in connection with the Contract. The costs of the Mediation are to be split by the parties, and each party bears the cost of his/her/its own attorney's fees incurred in connection with the Mediation. Therefore, please consider this letter as formal notification of my clients' claim of breach of contract and a demand for Mediation of such claim. I believe that it would certainly be efficacious for all concerned to work out a satisfactory settlement of this matter in Mediation. However, in the event that should not occur, the mediation is not "binding" on the parties, and accordingly, a civil action for Breach of Contract (and for recovery of attorney's fees and costs pursuant to paragraph 17 of the Contract) will be filed in the Broward County Circuit Court or the Federal District Court for the Southern District of Florida. In this regard, paragraph 16(b) of the Contract provides that, "Disputes not settled pursuant to this Paragraph 16 may be resolved by instituting action in the appropriate court having jurisdiction of the matter."

If you are represented by legal counsel, or in the event you retain such counsel, please transmit this letter to them, and have them contact me directly as soon as possible. My clients expect a response within no more than two (2) weeks of the date of this letter so that we can begin to make arrangements for the Mediation. Since I have advised my clients that other parties are likely to be liable to them for negligence in connection with the failure to timely provide the full

HOA documents to them, including the realtors for both sellers and purchaser it would be most desirable to have all affected parties participate in the Mediation, assuming that it is agreed among all to do so.

### PLEASE GOVERN YOURSELVES ACCORDINGLY!

Sincerely,

Michael L. Feinstein, Esq.
Fort the firm

cc:   Mr. & Mrs. Gregg